2014 CO 72

**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Ari Misha LIGGETT, Defendant–Appellee**

**Supreme Court Case No. 14SA88**

Supreme Court of Colorado.

September 22, 2014

George H. Brauchler, District Attorney, Eighteenth Judicial District, Susan J. Trout, Senior Deputy District Attorney, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Natalie Girard, Deputy Public Defender, Julia Marchelya, Deputy Public Defender, Jessica Enggasser Johnson, Deputy Public Defender, Centennial, Colorado, Attorneys for Defendant–Appellee.

JUSTICE BOATRIGHT delivered the Opinion of the Court.

¶ 1 In this interlocutory appeal pursuant to C.A.R. 4.1, we consider whether the trial court should have suppressed statements that Defendant–Appellee Mr. Ari Liggett made to investigators during an interview on October 17, 2012. The trial court suppressed the majority of the statements that Liggett made during this interview because it found that they were involuntary. We, however, hold that, when considering the totality of the circumstances, the investigators never overbore Liggett's will, and thus his statements were voluntary. Accordingly, we reverse the trial court's suppression order and remand the matter to the trial court for proceedings consistent with this opinion.

## I. Facts and Proceedings Below

¶ 2 A police officer stopped the vehicle that Liggett was driving and, upon asking dispatch to scan the license plate, determined that it was associated with both a missing person (Liggett's mother) and an armed-and-dangerous person (Liggett himself). After the police officer ordered Liggett to turn the car off and place his hands through the window, Liggett sped off and a police chase ensued. During the chase, when Liggett attempted to make a right turn, the vehicle spun out and hit a concrete wall. Liggett then exited the vehicle and ran, and the police chased him on foot. Eventually, Liggett threw his hands up and surrendered, and the officers handcuffed him.

¶ 3 Then, while "the officers were talking among themselves," Liggett made several unprompted statements, including:

- "I can't tell right from wrong. I'm insane. My psychiatrist will confirm it."
- "Hey guys, umm, I've just got a simple question. If I can convince you that there's not probable cause that I'm sane, do you press criminal charges?"
- "I think I'm God. I've thought so for years."
- "I think breaking most laws is the right thing to do...."
- "I think that everyone can read my mind, see the past and the future, and shape-change, and they aren't [inaudible] to any mortal weapons or abuse because they can use their mind to control their emotions. I think that the whole world is a conspiracy out to get me because I'm the only person who can't do a number of those things."

¶ 4 Without responding to Liggett's assertions, the officers placed him in the backseat of a police car because he was under arrest. At that time, Sergeant Peterson asked Liggett if he was okay. Liggett responded that he was physically fine but that the past couple of days had been difficult. On suspicion that Liggett was involved with his mother's disappearance, Sergeant Peterson then asked Liggett if he would be willing to go to the sheriff's office and speak with some investigators. Liggett answered in the affirmative, and the police then took him to the sheriff's office.

¶ 5 There, the investigators interviewed Liggett, un-handcuffed, in a small room. Liggett first spoke primarily with Investigator Clark and then separately with Sergeant Peterson. The interview began at approximately 2:50 a.m. when Investigator Clark stated, "I know that ... you came down here on your own," to which Liggett contradicted, "I actually didn't, you know. People, you know, um, more wanted to talk to me." Investigator Clark responded by asking Liggett, "[D]o you want to talk to me? I'll help you out how I can, okay?" Liggett did not answer the question but rather stated, "Um, basically it boils down to this" and then launched into a speech of sorts that included the following statements:

- "I've been a victim of society my whole life."
- "Ever since I was little ... I felt that everyone is, has, basically all the powers of God. They can shape-change to the past and future, anywhere, any time.... I think it's possible that I'm the only one who doesn't have those powers yet."
- "I think that, uh, breaking a lot of laws is the right thing to do."

¶ 6 Eventually, Investigator Clark returned Liggett to the task at hand, stating that he was going to read Liggett his *Mi-*

*randa* rights and clarifying, "[R]eally the things [sic] I need to talk to you about is your mom." After Investigator Clark read Liggett his *Miranda* rights, Liggett asked, "Can you call a public defender to be here now?" Investigator Clark responded, "No." He then gave Liggett a written copy of his rights and asked him to sign and initial the document. As Liggett prepared to sign the document, he stated, "You know, I would be found incompetent, um, at this present time.... Would all this be rejected as evidence if I talk to you?" Investigator Clark did not answer Liggett's question but stated, "So this is just up to you whether or not you want to talk or not." Liggett, in turn, did not respond directly to Investigator Clark's statement but asked where he should sign and initial the document.

¶ 7 After Liggett signed and initialed the document, Investigator Clark began asking him questions about his whereabouts for the past couple of days, which led to questions about his mother and culminated with, "Is your Mom hurt?" In response, Liggett first explained, "I think she might have committed suicide," and he eventually told Investigator Clark that she did so by ingesting potassium cyanide because she was "bipolar." And while he gave additional details over the course of the interview, he maintained that he found his mom dead and "panicked" because he needed money and was only included in her will as a trust beneficiary. Consequently, he decided to cover up her suicide so that he could continue to use her credit cards and checks. He further expounded that in an effort to conceal the suicide, he called two friends who came to the house to help him.[1]

¶ 8 Liggett also explained to Investigator Clark why he was not responsible for his mother's death. For example, after the investigator told Liggett that the police had found potassium cyanide in the family's refrigerator, Liggett stated numerous times that it would have been impossible for him to put a lethal dose of potassium cyanide in his mother's food without her noticing because of its strong odor and taste. He also stated that while he panicked and was worried about money when he found his mother dead, he had no motive to kill her because he was not worried about money in general—in fact, he was planning on filing several lawsuits that would result in substantial judgments in his favor. In response, Investigator Clark—testing another possible motive—stated that he had information that Liggett's mother was planning on asking him to leave the house when she got married. Investigator Clark asked Liggett whether that upset him. Liggett responded that he did not believe she really would have gotten married and that it was simply untrue that his mother and her fiancé had asked him to leave. He also explained that if they did get married, he would benefit because she would be "less abusive" to him and he "would have more money." Lastly, Liggett explained his version of events by repeatedly stating that his mother's suicide made sense because "1 in 20, uh, bipolars will commit suicide and [his mother] had severe bipolar."

¶ 9 In response to Liggett's statements, Investigator Clark's tone was cordial, and he never raised his voice. Indeed, throughout the entire interview, he remained calm and respectful while he persistently questioned Liggett about his actions; motives, and whereabouts over the past couple of days. Liggett provided answers to each question, never wavering from the following basic elements:

- his mother committed suicide;
- he found her dead; and
- two friends, whom he met in jail and refused to name, came to the house and helped him conceal his mother's death.

¶ 10 Then, approximately 1 hour and 20 minutes into the interview, Investigator Clark got Liggett a glass of water and they took a short break. Investigator Clark then changed tactics and sympathized with Liggett by asking, "Your mom didn't treat you fair, did she?" Liggett explained that in 10th grade he realized that everyone had the power to shape-change but him and that "every day [he] begged for help." Investigator

---

1. The trial court has limited the public's access to much of the evidence in this case, including the video and transcript of the interview at issue in this appeal. In deference to the trial court, we have omitted certain details that are not crucial to our analysis.

Clark and Liggett then had the following exchange:

> Investigator Clark: "And you wanted help."
>
> Liggett: "I wanted help very, very badly."
>
> Investigator Clark: "You mom didn't give it to you."
>
> Liggett: "My mom told me to go to the mental hospital."
>
> Investigator Clark: "And you didn't want to do that."

¶ 11 Starting from the premise that Liggett's mom "ha[d] been abusive to [him his] whole life," Investigator Clark then challenged Liggett, stating that he did not believe that the two men existed or that his mother committed suicide but rather that Liggett murdered her. Investigator Clark then expounded on how exactly Liggett murdered his mother. In response, Liggett kept denying the accusations and redirected the interview by telling Investigator Clark, "I need you to go through that step-by-step again, and this time we're gonna stop at each step, and I'm gonna explain to you why it didn't happen and give you evidence that it didn't happen." Investigator Clark then complied with the request by describing his account in snippets. Liggett responded by explaining why he thought Investigator Clark was wrong.

¶ 12 At this time and during the entire interview, Liggett frequently interjected with several statements related to themes about his beliefs and his mental state. For example, when Investigator Clark said, "You know, I really kind of need to know the names of these friends," Liggett responded, "I know you want to, but again, I . . . first of all I think breaking the law is the right thing to do." He also told Investigator Clark that he is God but possessed by demons:

> I'm possessed by demons and their knowledge of the force is just physically or, whatever you wanna call it, stronger than mine. . . . We live in a corrupt society where I am the, uh . . . uh, I'm the highest. I'm God so there's no one who can teach me how to be free.

He also asserted that this corrupt society was "out to get [him]." And, according to Liggett, his mother, in particular, sought to repress him: "[Y]ou know, I wanted out of that house very, very, very badly. I'm not her son, you know, I'm her victim. I've been trying to press charges on her for years. . . . I believe she's a shape changer who is willfully giving in to evil."

¶ 13 In response, Investigator Clark patiently allowed Liggett to assert his beliefs and even conceded that Liggett was the smarter of the two:

> Investigator Clark: "I told you once, I'm just a dumb cop."
>
> Liggett: "Alright, alright. I see. So I gotta work with you down here."
>
> Investigator Clark: "Please do. At my level."
>
> Liggett: "Alright."
>
> Investigator Clark: "Can you do that?"
>
> Liggett: "I'll do my best."

Investigator Clark then attempted to get Liggett to speak at his "level" and, for the remainder of the interview, to tell him "the truth." Despite the investigators' variety of different interrogation tactics, Liggett maintained his version of events. The interview with Investigator Clark ended with Liggett explaining that his mother could have put the potassium cyanide into any food substance to commit suicide, while acknowledging that it was possible, but "unlikely," that she accidentally ingested it. In total, Investigator Clark's interview of Liggett lasted over three hours, including two short breaks during which Investigator Clark got Liggett water to drink. At no point did Liggett accept any responsibility for his mother's death.

¶ 14 Then, after a 1–hour–and–18–minute break—during which Liggett used the restroom, and the investigators got Liggett breakfast and 2 cups of coffee—Sergeant Peterson, who had spoken with Liggett in the police car, interviewed him for approximately 1 hour. At the outset, he stated, "I just didn't know if there was anything you wanted to talk to me about because we had seen each other earlier tonight when you were in the car." After a digression, during which Liggett confirmed that he was not injured and learned that Sergeant Peterson was investigating his mother's disappearance,

Liggett directed the interview by asking Sergeant Peterson, "So tell me about what's going through your mind about [the investigation]." Sergeant Peterson countered by stating that he was really trying to get Liggett to "share [his] thoughts," and for the remainder of this portion of the interview, he told Liggett that he knew Liggett had killed his mother. Instead of asking what happened, Sergeant Peterson asked Liggett why he murdered his mother, for example, stating, "[Liggett],[2] will you tell me why you had to kill your mom? Please? Just tell me why it had to happen. There has to be a reason." Again, Liggett responded by maintaining that his mother committed suicide because she was "bipolar." He also emphasized the same themes that he had discussed with Investigator Clark:

- "Um, everyone has the power to shape-change.... They have the power to see the past and the future. They have the power to read everyone's mind. They have the power to influence events.... With everyone's power it doesn't make any sense except to repress people like me who are possessed by demons and haven't been able to tap into those powers."

- "My views of right and wrong are very different from society. I believe that for me to commit most crimes against most people is the right thing to do."

- "[My mom] was, um, actually, uh, fairly vicious towards me. Every tone, every gesture was meant to humiliate, repress, and weaken me."

- "I am God. The way, the truth, and the light."

¶ 15 Approximately halfway through this portion of the interview, Sergeant Peterson asked Liggett, "I have a couple other questions if you don't mind, is that okay? Or do you want to stop?" Liggett responded, "No, you can ask what you're gonna ask." Sergeant Peterson then continued to ask Liggett why he killed his mother. Not only did Liggett not tell Sergeant Peterson why he supposedly killed his mother, but he dis-

greed with Sergeant Peterson about the basic premise—that he had in fact killed her: "If you tell me your evidence, I can tell you why it didn't happen that way." Instead of answering, Sergeant Peterson kept pressing him, even addressing him in the third person:

> Sergeant Peterson: "Why did [Liggett] have to kill his mom? If you're God, you would know."
>
> Liggett: "[Liggett] did not kill his mom."
>
> Sergeant Peterson: "We both know he did."
>
> Liggett: "We don't know he did."
>
> Sergeant Peterson: "No, we both know he killed his mom, but I don't know the reason why. You know that."
>
> Liggett: "[Liggett] did not kill his mom."

¶ 16 After that exchange, Sergeant Peterson told Liggett that he was "gonna have to leave this room" because he had a meeting to attend. The interview then ended similarly to how the entire colloquy had proceeded, with Sergeant Peterson asking, "Are you gonna tell me why you had to kill her?" and Liggett responding, "I didn't do it." A police officer then handcuffed Liggett and took him to jail.

¶ 17 Subsequently, the People charged Liggett with one count each of first-degree murder, crime of violence, and vehicular eluding.[3] Liggett pled not guilty by reason of insanity, and the court ordered a sanity evaluation. Dr. Wortzel of the Colorado Mental Health Institute at Pueblo conducted a Sanity and Mental Condition Evaluation, which included a review of Liggett's interview on October 17, 2012.

¶ 18 During pre-trial motions, Liggett moved to suppress the statements he made during the interview on October 17, 2012, arguing that they were involuntary. The trial court found that Liggett's question to Investigator Clark—"Can you call a public defender to be here now?"—was an "unequivocal invocation" of his right to counsel, and as a result, it found that Investigator Clark violated Liggett's *Miranda* rights when he responded, "No." The trial court

---

2. Throughout the entire interview, the investigators referred to Mr. Liggett by his first name, Ari.

3. The trial court dismissed the vehicular eluding charge at a preliminary hearing.

therefore found it "important to delineate between the initial statements at the sheriff's office before the *Miranda* warnings and then the statements subsequent to the *Miranda* warnings." After considering several factors, including the *Miranda* violation, the court denied Liggett's motion as to the statements he made before Investigator Clark violated his *Miranda* rights. The trial court, however, suppressed the statements Liggett made after Investigator Clark denied his right to an attorney because of the *Miranda* violation and because it found those statements to be involuntary. Further, because Dr. Wortzel watched the video of the interview as part of his evaluation, the trial court ordered a new sanity evaluation and precluded Dr. Wortzel from testifying at trial. The People then filed this interlocutory appeal.[4]

## II. Standard of Review

¶ 19 Whether statements should be suppressed because they are involuntary presents a mixed question of law and fact. *People v. McIntyre*, 2014 CO 39, ¶ 13, 325 P.3d 583. As to the trial court's factual findings, we defer to them as long as they are supported by competent evidence. *Id.* We review the legal effect of those facts, however, de novo. *Id.*

## III. Analysis

¶ 20 The issue here is whether the investigators coerced Liggett into speaking with them so as to overbear his will. To resolve this issue, we first review the law surrounding voluntariness. We then apply this law to the facts of this case and conclude that the investigators did not coerce Liggett into making the statements but rather that Liggett spoke voluntarily.

## A. Law of Voluntariness and Coercion

¶ 21 In order for a defendant's statements to be admissible, the due process

clauses of both the United States and Colorado Constitutions require that they be voluntary. *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010). A statement is voluntary if it is "'the product of an essentially free and unconstrained choice by its maker.'" *Id.* (quoting *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982)). In contrast, a statement is involuntary if "coercive police conduct played a significant role in inducing [the statement]." *People v. Zadran*, 2013 CO 69, ¶ 12, 314 P.3d 830.

¶ 22 To ascertain whether a defendant's statements are involuntary because the police's conduct was coercive "so as to overbear the defendant's will," *id.* at ¶ 10, we must conduct a totality-of-the-circumstances analysis that focuses on "the significant details surrounding and inhering" in the questioning, *People v. Ramadon*, 2013 CO 68, ¶ 20, 314 P.3d 836. As part of this analysis, we must contemplate "'both the defendant's ability to resist coercive pressures and the nature of the police conduct.'" *McIntyre*, ¶ 17 (quoting *Ramadon*, ¶ 20). In particular, we consider several "non-exhaustive" factors:

1. whether the defendant was in custody;

2. whether the defendant was free to leave;

3. whether the defendant was aware of the situation;

4. whether the police read *Miranda* rights to the defendant;

5. whether the defendant understood and waived *Miranda* rights;

6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

7. whether the statement was made during the interrogation or volunteered later;

---

4. Section 16–12–102(2), C.R.S. (2014), allows the prosecution to file an interlocutory appeal after the trial court grants a motion to suppress evidence if the prosecution "certifies to the judge who granted such motion and to the supreme court that the appeal is not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against

the defendant." The People here filed such a certificate, and in their Opening Brief they indicated that the video of the interview on October 17, 2012, and Dr. Wortzel's report are a substantial part of their case because they may seek to introduce them as rebuttal or impeachment evidence.

8. whether the police threatened [the] defendant or promised anything directly or impliedly;

9. the method [or style] of the interrogation;

10. the defendant's mental and physical condition just prior to the interrogation;

11. the length of the interrogation;

12. the location of the interrogation; and

13. the physical conditions of the location where the interrogation occurred.

*Id.* (alterations in original) (quoting *Zadran,* ¶ 11). When analyzing these factors, we do not "perform a purely quantitative comparison and mechanically tally those factors suggestive of voluntariness against those indicative of coercion." *Id.* at ¶ 20 n.2. Rather, we must consider these factors to inform the ultimate inquiry, which is whether the police's conduct was coercive " 'so as to overbear the defendant's will.' " *See id.* at ¶ 16 (quoting *Zadran,* ¶ 10).

¶ 23 Having reviewed the law surrounding voluntariness, we now consider whether the trial court erred when it suppressed the statements Liggett made to the investigators during the interview on October 17, 2012.

**B.  Application to This Case**

■ ¶ 24 After reviewing the record and considering the totality of the circumstances, we conclude that Liggett spoke voluntarily. The record reflects that, although the majority of the factors weigh against a finding of voluntariness, the critical inquiry—whether the investigators actually overbore Liggett's will—necessitates a different conclusion. Importantly, from the outset, Liggett wanted to talk and tell the investigators his version of events and his beliefs. In addition, while the investigators repeatedly accused Liggett of killing his mother, Liggett—throughout the entire, lengthy interview—resolutely denied that he had any role in her death. Thus, the investigators did not overbear Liggett's will. As such, the trial court should not have suppressed his statements.

¶ 25 At the hearing on Liggett's motion to suppress, the trial court made findings regarding each of the 13 factors. The trial court proceeded factor by factor, asking the parties to present arguments before it made findings. After the court made individual findings on each factor, it found the following findings to be of "particular import": (1) the interview occurred during the very early morning hours; (2) the interview was long; (3) the investigators improperly denied Liggett counsel; and (4) Investigator Clark promised Liggett, "I'll help you out how I can." The court then found that when Liggett "invoked his right to counsel," the scale tipped toward involuntariness, and consequently, it suppressed the statements Liggett made after he asked if Investigator Clark could call a public defender.

¶ 26 Admittedly, as the trial court found, most of the factors do militate toward a finding that the investigators' conduct was coercive. Specifically, Liggett spoke during a custodial interrogation in a small room at the sheriff's office and was not given the opportunity to confer with counsel. In addition, the interview was long, it occurred during the early morning hours, and Liggett had been awake for a lengthy period of time. The People have also conceded that the investigators violated Liggett's *Miranda* rights.[5]

¶ 27 Not all of the factors that the trial court relied on, however, indicate that the investigators were coercive. Although the trial court found that Investigator Clark made a promise to Liggett at the beginning of the interview when he stated, "I'll help you out how I can, okay?" this statement was never referenced again, and the investigators mentioned no specific guarantees to help Liggett. As such, Investigator Clark's vague promise was merely an "attempt[ ] to establish a friendly rapport with [Liggett]." *See Zadran,* ¶¶ 15–16 (noting that the trial court found the statement, "I think it would be in your best interest to talk to me," was an implied promise but finding that this statement did not amount to coercion because it was meant to "establish a friendly rapport").

5.  Statements obtained in violation of *Miranda* are not necessarily involuntary, but they are inadmissible in the People's case-in-chief. *People v. N.A.S.,* 2014 CO 65, ¶ 17, 329 P.3d 285.

It was not a specific promise that induced Liggett into speaking with him. *See id.* at ¶¶ 17–19 (considering whether threats or promises were specific enough so as to overbear the defendant's will and constitute coercion); *see also People v. Parada,* 188 Colo. 230, 232–34, 533 P.2d 1121, 1122–23 (1975) (finding that an implied promise that statements would not be used against the defendant in court rendered the subsequent statements involuntary); *People v. Quintana,* 198 Colo. 461, 462–64, 601 P.2d 350, 350–52 (1979) (finding that statements were involuntary where the sheriff promised, amongst other things, that he would talk to the defendant's former employer about re-hiring him if the defendant talked with him).

¶ 28 In addition, as the trial court found, the investigators never—in five and a half hours—threatened Liggett. While the investigators were honest with Liggett about how they thought his mother died, they never bullied him into agreeing with them. The investigators also never successfully "exploited [Liggett's] weaknesses or vulnerabilities." *Zadran,* ¶ 16; *cf. Ramadon,* ¶ 25 (finding that the threat of deportation was a "uniquely terrifying prospect" for the defendant, who had been "brought to the United States for his safety after members of his family were killed by the Iraqi military").

¶ 29 As to Liggett's "mental and physical condition," the trial court found that there was "no obvious physical condition that would have negatively impacted [Liggett's] ability to engage in this interview or interrogation." The record supports this finding. Both Investigator Clark and Sergeant Peterson asked if Liggett was hurt in the car accident, and aside from a scrape on his arm, Liggett indicated that he felt fine. Regarding Liggett's mental condition, the trial court found that some of his responses were "bizarre." But it is also clear that Liggett understood where he was and the nature of the interrogation. He also followed the investigators' questions. When a question did confuse him, he asked for clarification. For example, when Investigator Clark characterized Liggett's living arrangement as "kind of walking on eggshells," Liggett asked Investigator Clark to "explain that."

¶ 30 In response to Liggett's questions and statements, the investigators, throughout the interview, calmly and politely spoke to Liggett, and thus the "method and style of the interrogation" also cuts against a finding that the investigators were coercive. They never insulted Liggett nor used a derogatory tone. And, while Investigator Clark repeatedly asked Liggett to speak at his "level," his tone was not condescending. He again was attempting to establish a friendly rapport with Liggett. In addition, although Sergeant Peterson asked questions that assumed that Liggett had killed his mother and engaged in repetitive questioning, his conduct was not coercive. Sergeant Peterson did not persuade Liggett to provide more information than he had already provided to Investigator Clark or change his story. *Cf. Raffaelli,* 647 P.2d at 236 (finding substantial evidence in the record for the trial court's finding that statements were involuntary where the questions were repetitive, creating a stressful situation that resulted in a confession). To the contrary, Liggett resisted this tactic, even adamantly disagreeing that he had killed his mother. *See Ramadon,* ¶ 20 (stating that courts must consider "the defendant's ability to resist coercive pressures"). Namely, Sergeant Peterson's last question was, "Are you gonna tell me why you had to kill her?" to which Liggett responded, "I didn't do it." Thus, during the entire five-and-a-half-hour interview, other than providing additional details in response to the investigators' questions, Liggett never changed his story that his mother committed suicide. Simply put, he never succumbed to the investigators' suggestion that he killed his mother.

¶ 31 Liggett not only conversed freely with the investigators and resisted their tactics, but he even reinitiated the conversation several times throughout the morning. For example, during the first water break, Liggett was drinking a glass of water, and the investigators were talking in the hallway with the door to the interview room ajar. Liggett shouted to one of the investigators, "[G]entleman, one other thing.... I have one other thing to tell the detectives." After about a minute, Investigator Clark returned to the room and asked Liggett, "You said you want-

ed to talk to me?" Liggett responded, "Yeah, uh, I wanted to say that, uh, my mom had, um, given me permission to drive her car and, uh, use her credit card for basically emergencies."

¶ 32 Similarly, during the second water break, Liggett again volunteered information to Investigator Clark while they were waiting for another investigator, who had primarily been listening to the interview, to return:

Investigator Clark: "I tell you what, my partner has to use the facilities. Do you have to use the facilities at all?"

Liggett: "Um . . ."

Investigator Clark: "No?"

Liggett: "I can wait."

Investigator Clark: "We'll just wait for him to get back."

Liggett: "You know, um . . . my psychiatrist and, um, therapist, um, can prove that I have a completely inculpable state of mind, also, and have had it for months."

Investigator Clark: "Okay. So, what does that mean to you?"

Liggett: "It means I'm not criminally liable."

¶ 33 In addition to the fact that Liggett indicated on several occasions that he wanted to speak with Investigator Clark, Sergeant Peterson repeatedly asked Liggett if he wanted to talk:

- "Would you mind answering a couple other questions for me?"
- "Can I ask you a pretty direct question?"
- "Can I ask you a question?"

Crucially, approximately halfway through the interview, Sergeant Peterson asked Liggett, "I have a couple other questions if you don't mind, is that okay? Or do you want to stop?" Liggett responded, "No, you can ask what you're gonna ask." So, Sergeant Peterson gave Liggett the option of ending the interview, but Liggett allowed him to continue asking questions.

¶ 34 Liggett's eagerness to converse was evidenced even at the very beginning of his encounter with the police, at the site of the car crash. As the trial court found, shortly after the car crash, Liggett started talking to the officers, even asking them a question, "If

I can convince you that there's not probable cause that I'm sane, do you press criminal charges?" These statements were not only unprompted, but the similarity between Liggett's initial statements and the statements he made later during the interview suggests that Liggett wanted to tell the investigators very specific things, including: (1) he cannot tell right from wrong; (2) a court would find him incompetent; (3) everyone else has the ability to shape-change but him; (4) he is God; and (5) society and his mother, who had abused him, seek to repress him. Thus, even though Liggett's first statements are not at issue in this appeal, they demonstrate Liggett's willingness—even a desire—to talk, which indicates that the investigators did not overbear his will, and that his statements were voluntary.

¶ 35 That said, while some factors indicate that the investigators' conduct was not coercive, as the trial court found, the majority of them *do* indicate that Investigator Clark and Sergeant Peterson were coercive. But "[v]oluntariness should not be ascertained through rote tabulation." *McIntyre*, ¶ 20 n.2. Courts cannot simply "mechanically tally" the factors to determine whether a statement is involuntary. *Id.* The factors are "non-exhaustive," and courts must consider the totality of the circumstances of each case. *Id.* at ¶¶ 16–17. In determining whether a statement is voluntary, courts must keep the reason for considering these factors—the ultimate inquiry—in mind: whether the police's conduct "actually overbore the defendant's will." *Id.* at ¶ 19 (stating that the "critical issue in determining voluntariness . . . is whether [the interviewing officer] actually overbore the defendant's will"). In this instance, the trial court never considered the nexus between the investigators' actions and Liggett's statements to them. Simply put, it never considered whether the investigators actually overbore Liggett's will.

¶ 36 When considering the ultimate inquiry, we conclude that under the totality of the circumstances, Investigator Clark and Sergeant Peterson did not overbear Liggett's will. Importantly, Liggett wanted to tell the investigators his story and his beliefs, including that: (1) he cannot tell right from wrong;

(2) a court would find him incompetent; (3) everyone else has the ability to shape-change but him; (4) he is God; (5) society and his mother seek to repress him; and, most importantly, (6) his mother's death was a suicide. Furthermore, while the investigators did get Liggett to provide several details regarding the previous couple of days, his version of events never changed during the entire five-and-a-half-hour interview. And even though the investigators assumed that Liggett had killed his mother, Liggett, to the very end, disagreed with them and denied any responsibility in causing her death. Thus, Liggett's will was not overborne. As a result, we conclude that Liggett spoke voluntarily.

## IV. Conclusion

¶ 37 For the foregoing reasons, we hold that, when considering the totality of the circumstances, the investigators never overbore Liggett's will, and thus his statements were voluntary. Accordingly, we reverse the trial court's suppression order and remand the matter to the trial court for proceedings consistent with this opinion.