23CA0013 Peo v Gonzales 05-14-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0013
Weld County District Court No. 20CR1792
Honorable Vincente G. Vigil, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joseph Junior Gonzales,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE HARRIS
Dunn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

---

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Michael C. Mattis, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1　　A jury found defendant, Joseph Junior Gonzales, guilty of first degree murder.[1]  On appeal, Gonzales contends that the trial court erred by denying his motion to suppress evidence and by failing to impose sufficient restrictions on the jury's access to video exhibits. We affirm.

## I.　　Background

¶ 2　　In September 2020, Abdul Jefferies was fatally shot at a motel in Evans, Colorado.  The motel's video surveillance system and police pole cameras recorded some of the relevant events.

¶ 3　　One video showed a man wearing a gray hooded sweatshirt and a mask leave room 219 and, joined by two others, walk to room 142.  From there, a camera recorded the three men climbing stairs to a balcony where Jefferies was standing.  The man in the gray sweatshirt pulled out a gun and shot Jefferies multiple times in the head and back.  The three men fled down a corridor back to room 219.

---

[1] Gonzales was also charged with possession of a weapon by a previous offender.  After being convicted of murder in a bifurcated trial, Gonzales entered an *Alford* plea to the weapons charge.

¶ 4     When police responded to the motel, they quickly apprehended Manuel Edwards, a police informant.  He admitted to being one of the men shown on the surveillance videos, and he identified the shooter as "JoJo."

¶ 5     Gonzales was also arrested at the motel, and, during a custodial interview, he made inculpatory statements about his potential motive for the shooting.

¶ 6     The prosecution charged Gonzales with first degree murder.  The primary issue at trial was the identity of the shooter.  To establish that the shooter was Gonzales, the prosecution presented, among other evidence, testimony from Jefferies's girlfriend, video footage, a recorded jail call, and the recorded interviews of Gonzales and the informant.[2]

¶ 7     Jefferies's girlfriend testified that she lived at the motel in room 142.  Just before the shooting, three men came to her room looking for Jefferies.  The girlfriend recognized one of them as "JoJo," a man she had previously seen at the motel a "handful of times."  The girlfriend was aware that JoJo had a conflict with

---

[2] The informant failed to appear at trial and the parties agreed to admit his recorded interview into evidence.

Jefferies; the day before the shooting, JoJo told the girlfriend that he intended to resolve the conflict with "a knife or a gun" if necessary. About a minute after the three men left her room, she heard gun shots. At trial, the girlfriend identified Gonzales as "JoJo."

¶ 8     During his interview, the informant told the officers that JoJo shot Jefferies with a revolver. When police searched room 219, where the three men had retreated after the shooting, they found a revolver hidden in the mattress. Testing later established "strong support" for the conclusion that Gonzales's DNA was on the revolver.

¶ 9     At the time of the shooting, both Gonzales and the informant were on parole and wearing GPS ankle monitors. Gonzales's parole officer testified that Gonzales used the nickname JoJo, and she identified Gonzales as one of the three men depicted on the surveillance video. Gonzales's GPS signals established that he was near the informant around the time of the shooting and that his movements mimicked those of the man in the gray sweatshirt.

¶ 10     A detective who listened to Gonzales's jail calls testified that, in the first call after his arrest, Gonzales "admit[ted] to th[e] crime."

The audio recording of the call is difficult to understand, but, according to the detective, Gonzales told the woman on the phone that he "wasn't going to let [some unidentified man] touch [her]" and that he worried what that man "would have done to [her] if" Gonzales "didn't do it."

¶ 11    The jury found Gonzales guilty of first degree murder.

## II.    Motion to Suppress Statements

¶ 12    In the second half of his hour-long custodial interview, Gonzales admitted that he had a reason to kill Jefferies.  He told the detective that Jefferies had done something to a woman with whom he was close, but he could not disclose more because the woman had sworn him to secrecy.  When the detective posited that Jefferies had beaten or raped the woman, Gonzales nodded.  Later, Gonzales said that he was loyal to a fault.

¶ 13    Before trial, Gonzales moved to suppress his interview statements as involuntary.  After a hearing, the trial court denied the motion, finding that police did not act "coercively" during the interview.

¶ 14    On appeal, Gonzales contends that the court erred by denying the motion because the statements about his motive to shoot Jefferies were induced by police coercion.

### A.    Legal Principles and Standard of Review

¶ 15    "A defendant's statements may be admitted into evidence only if they are voluntary." *Cardman v. People*, 2019 CO 73, ¶ 21. Statements are not voluntary if the interrogating officer's conduct was "coercive so as to overbear the defendant's will in making the statements." *People in Interest of Z.T.T.*, 2017 CO 48, ¶ 12 (citation omitted). In other words, an involuntariness finding requires *both* that the police conduct was coercive *and* that the coercive conduct "played a significant role in inducing the statements." *People v. Ramadon*, 2013 CO 68, ¶ 20.

¶ 16    In evaluating voluntariness, we consider the totality of the circumstances, including (1) whether the defendant was in custody or was free to leave; (2) whether the defendant was aware of the situation; (3) whether the defendant was advised of and knowingly waived his *Miranda* rights; (4) whether the defendant had an opportunity to confer with counsel; (5) whether the statement was made during the interrogation or volunteered later; (6) whether the

5

police threatened the defendant or promised anything directly or impliedly; (7) the method or style of the interrogation; (8) the defendant's mental and physical condition just before the interrogation; and (9) the length, location, and conditions of the interrogation.  *Cardman*, ¶ 23.

¶ 17    When the interrogation is recorded and there are no disputed facts outside the recording, we are in the same position as the trial court to assess the circumstances and determine the voluntariness of the defendant's statements.  *People v. Taylor*, 2018 CO 35, ¶ 7. Accordingly, our review is de novo.  *Id.*

### B.    Analysis

¶ 18    There was nothing atypical about the interrogation.  Gonzales was in custody, he was aware within a few minutes that he was a suspect in the shooting, he was advised of and validly waived his *Miranda* rights and therefore did not consult with counsel during the interrogation, the interviewing detective spoke in a conversational tone (the detective had known Gonzales and his family for many years and most of the interview had a friendly tenor), Gonzales appeared alert and comfortable, and the interview lasted about an hour and occurred in an ordinary police station

interview room with two officers present but only one asking questions. These circumstances weigh in favor of a voluntariness finding.

¶ 19 Gonzales does not seriously dispute these facts or their legal significance. But he argues that the detective lied about the strength of the evidence against him and threatened to arrest his family members, thereby overbearing his will and inducing the incriminating motive statements.

¶ 20 True, the detective repeatedly told Gonzales that the surveillance video showed him shooting Jefferies. Gonzales argues that these statements were lies because no one could "conclusively identify the hooded, masked shooter . . . from the video alone." But by the time of Gonzales's interview, about eight hours after the shooting, the detective had more information than the video images alone. With the informant's help, police had identified Gonzales as the man in the gray sweatshirt. Thus, the detective had a basis beyond the video images for his statement that the video showed Gonzales shooting Jefferies.

¶ 21 In any event, "[p]loys to mislead a suspect" do not necessarily constitute coercion that renders a suspect's interview statements

involuntary. *People v. Munoz-Diaz*, 2023 COA 105, ¶ 26 (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)); *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (officer's false claim that the co-suspect had confessed did not render the defendant's confession involuntary); *Lucero v. Kerby*, 133 F.3d 1299, 1312 (10th Cir. 1998) (officer's false statement about fingerprint evidence did not render the defendant's statements involuntary); *People v. Stephenson*, 56 P.3d 1112, 1120 (Colo. App. 2001) (officer's false claim that he had "independent evidence" of defendant's guilt, even in combination with other allegedly improper techniques, did not render the defendant's statements involuntary).

¶ 22 Also true, about halfway through the interview, the detective reminded Gonzales that in a prior case, Gonzales's family members were charged as accessories to his criminal conduct, and he suggested that the same result could happen "[o]n this case," though he did not explain why. We will assume that this comment constituted an implied threat to arrest Gonzales's family members without any legal basis, which we agree is coercive. *See People v. Smiley*, 2023 CO 36, ¶ 29 ("It is . . . coercive for officers to say or

8

imply that harm will come to the suspect's friends or family unless they confess.").

¶ 23    Still, to be involuntary, the inculpatory statements must be "causally related" to the officer's coercive conduct. *People v. Medina*, 25 P.3d 1216, 1222 (Colo. 2001) (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)). And here, the detective's tactic did not yield any inculpatory statements. Rather, in response to the implied threat, Gonzales calmly asked, "Why would that happen? I didn't do anything." The detective promptly abandoned this tactic and never mentioned Gonzales's family again. *Cf. People v. Liggett*, 2014 CO 72, ¶ 27 (investigator's "promise" that he would "help [the defendant] out how [he] c[ould]" was not coercive, partly because it "was never referenced again").

¶ 24    It was not until the detective implemented a new strategy of pressing Gonzales to provide a reason or excuse for the shooting that Gonzales admitted that he had a motive to kill Jefferies. But even then, Gonzales did not confess to the shooting. After a series of questions about what the informant and the third man knew about the shooting, which Gonzales did not answer, the detective asked, "Are you saying they didn't know you were gonna kill

9

[Jefferies]?" to which Gonzales responded, "I'm not saying anything."

¶ 25     To the extent Gonzales argues that the detective's pressure to provide a reason amounted to coercion, we disagree. While the detective said that an "excuse" might improve Gonzales's standing with the jury at trial, he did not make any promises, express or implied, that a confession would result in lesser charges or a lighter sentence. *See People v. Perez-Rodriguez*, 2017 COA 77, ¶ 51 (The detective's "suggest[ions] that judges or prosecutors may be more lenient on a defendant who they perceive as being honest and who 'took responsibility' for his actions . . . d[id] not promise any sort of leniency or guarantee any special treatment."); *People v. Springsted*, 2016 COA 188, ¶ 33 (finding statements voluntary when officer said the defendant would receive "more slack" if he was honest but "did not link it to [the defendant's] potential receipt of any particular benefit").

¶ 26     Based on our review of the interview, and considering all the circumstances, we conclude that Gonzales's statements were voluntary, and, therefore, the trial court did not err by admitting the interview into evidence.

### III.  Jury Access to Video Exhibits

¶ 27    During deliberations, the jury requested access to several video exhibits: three testimonial exhibits, including, as relevant here, the informant's recorded interview, and various surveillance videos.  After a discussion with counsel, the court gave the jury access to the exhibits but imposed a roughly two-hour time limit on its access to the testimonial exhibits.[3]

¶ 28    On appeal, Gonzales contends that the court erred by failing to "impose controls on the jury's use" of the exhibits.

---

[3] The court instructed the jury as follows:

> As to the request to review the [custodial interrogation], the [informant's] interview, and [jail] phone call, the [c]ourt will allow the jury two hours and ten minutes to review those three exhibits.  My staff will assist with the playing of those exhibits.  You are free to utilize the entire courtroom and move about as needed to be able to see and hear the exhibits with clarity.

> With respect to the . . . surveillance videos, the [c]ourt will allow the jury to review those exhibits without restriction.  My staff will assist with the playing of those exhibits.  You are free to utilize the entire courtroom and move about as needed to be able to see and hear the exhibits with clarity.

### A. Legal Principles and Standard of Review

¶ 29 The trial court retains broad control over the use of exhibits during jury deliberations. *DeBella v. People*, 233 P.3d 664, 666 (Colo. 2010). But because of the risk that jurors might give testimonial exhibits "undue weight or emphasis," *Ray v. People*, 2019 CO 21, ¶ 16, in deciding how much access to give the jury to those types of exhibits, the court must exercise its discretion to ensure that the jury will not "use [the] exhibits in a manner that is unfairly prejudicial to a party," *Frasco v. People*, 165 P.3d 701, 704 (Colo. 2007).

¶ 30 To mitigate the risk of undue prejudice, the court may implement various safeguards, including waiting for a jury's request to review testimonial exhibits before providing access, instructing the jury not to give an exhibit undue weight, and limiting the number of times a jury may access an exhibit. *DeBella*, 233 P.3d at 669; *People v. Jefferson*, 2017 CO 35, ¶ 56; *see also Ray*, ¶ 16 (explaining that while the court must guard against exhibits being given undue weight or emphasis, "we have never circumscribed the trial court's discretion . . . by mandating time limitations on jury access or requiring particular limiting instructions").

¶ 31    But because "[t]he same danger of undue emphasis does not inhere in non-testimonial evidence like . . . crime scene video[s]," a trial court need not consider potential prejudice before providing jurors with unrestricted access to those exhibits. *Rael v. People*, 2017 CO 67, ¶¶ 23-24.

¶ 32    We will not disturb the trial court's decision regarding jury access to an exhibit unless the court's decision was manifestly arbitrary, unreasonable, or unfair or was based on an erroneous application of the law. *People v. Smalley*, 2015 COA 140, ¶ 59.

B.    Analysis

1.    The Informant's Recorded Interview

¶ 33    As an initial matter, to the extent Gonzales argues that the jury had "unfettered" access to the informant's recorded interview, we disagree. "[U]nfettered" means "not controlled or restricted," Merriam-Webster Dictionary, https://perma.cc/KP8T-YA5E, and here, the trial court restricted the jury's access to the exhibit by imposing a time limit.

¶ 34    We also reject Gonzales's contention that, notwithstanding this restriction, the trial court abused its discretion by failing to

13

limit the jury to a single viewing of the interview from beginning to end.

¶ 35    The trial court rejected this option, in part, because it found portions of the interview difficult to hear and thought the jury might need to replay certain parts to understand what was said.  While the jury did not specifically note any problems with the exhibit's audio quality during the trial, based on our independent review, we agree with the trial court that the video is, at times, difficult to hear and understand.

¶ 36    Under the circumstances, it was not manifestly unreasonable for the trial court to impose alternative safeguards to prevent prejudice from the jury's use of the testimonial exhibits.  *See Martinez v. People*, 2017 CO 36, ¶ 27 ("The precise procedure to be followed to ensure [that a party is not unfairly prejudiced by the jury's use of exhibits] . . . lies within the court's sound discretion."). The court waited for the jury to request the exhibits before providing access; required court staff to supervise the jury's use of the exhibits; and imposed, as noted, an approximately two-hour time limit for the jury to review both interviews and Gonzales's jail call, thereby necessarily limiting the number of times the jury could

watch the interview.[4] *See DeBella*, 233 P.3d at 669; *see also People v. Johnson*, 2016 COA 15, ¶ 39 (approving the trial court's limited restrictions on the jury's use of exhibits when the court "understood its authority, and obligation, to consider whether imposition of certain restrictions . . . was necessary").

¶ 37     In crafting these safeguards, the court explained that it was "balancing the concerns about placing undue weight on any [testimonial] exhibits . . . against the concerns that the [c]ourt ha[d] regarding that some of the videos are difficult to hear." In other words, the court implicitly found that access to the informant's interview would assist the jury in its deliberations and, given the restrictions, would not unfairly prejudice Gonzales. *See Frasco*, 165 P.3d at 704-05.

¶ 38     We agree with the trial court and therefore reject Gonzales's claim of prejudice. The supreme court has twice discerned reversible error in trial courts' decisions to grant juries unfettered access to testimonial exhibits. *See Jefferson*, ¶¶ 2-3; *DeBella*, 233 P.3d at 669. In those cases, which involved child sexual assault

---

[4] Each of the interviews was about an hour and the jail call lasted about three minutes.

victims' recorded statements, the court noted the substantial risk that the jury had placed undue weight or emphasis on the videotaped interviews because (1) the victim's trial testimony and out-of-court statements contradicted each other, which underscored the centrality of the victim's credibility; and (2) the video served as "the linchpin of the prosecution's case." *Jefferson*, ¶ 59 (citation omitted), *DeBella*, 233 P.3d at 668-69.

¶ 39     The circumstances here do not present the same likelihood that the jury placed undue weight or emphasis on the informant's recorded interview. First, there were no inconsistencies between the informant's trial testimony and his interview statements, as he did not testify at trial. And because defense counsel stipulated to the admission of the interview in lieu of the informant's testimony, we find unpersuasive Gonzales's complaint on appeal that the recording took on more importance due to the informant's absence. Second, the informant's interview was hardly the "linchpin" of the prosecution's case. In child sex assault cases, the child's out-of-court statements often present the only full account of the crime, and therefore, the jury is more likely to place undue weight on those statements. True, in one respect, the informant was the only

16

eyewitness to the crime, but the shooting and surrounding events were on video, so his account was mostly cumulative of the video evidence. The informant's main contribution was identifying the man in the gray sweatshirt as "JoJo," but three other witnesses — Jefferies's girlfriend, Gonzales's probation officer, and the detective who interviewed Gonzales — were also able to connect Gonzales to the crime.

¶ 40 For these reasons, we conclude that the trial court did not abuse its discretion by allowing the jury limited access to the informant's interview.

### 2. Nontestimonial Surveillance Videos

¶ 41 At trial, defense counsel generally agreed that the jury should have unlimited access to the surveillance videos but asked the court to preclude the jury from "zoom[ing] in or zoom[ing] out" on the images. After expressing doubt that the computer system "ha[d] that type of function," the court denied the request.

¶ 42 Gonzales contends that the trial court failed to exercise its discretion to limit the jury's access to the nontestimonial video exhibits, which, he says, constitutes an abuse of discretion.

¶ 43    But the court did not need to consider whether to set any limits on the jury's use of nontestimonial exhibits.  *See Rael*, ¶ 21. The assessment of assistance to the jury versus possible prejudice to the defendant is required only for testimonial exhibits — that is, "exhibits substituting for trial testimony."  *Id.* at ¶ 22; *see also People v. Russom*, 107 P.3d 986, 989 (Colo. App. 2004) ("Jurors may have access during deliberations to nontestimonial recordings that depict the event itself rather than a narration thereof.").

¶ 44    Accordingly, we discern no abuse of discretion in the trial court's decision to grant the jury unfettered access to the surveillance videos.  *See Rael*, ¶ 24.

## IV.    Cumulative Error

¶ 45    Finally, we reject Gonzales's argument that he is entitled to a new trial based on the cumulative effect of these errors.  Because we have concluded that the court did not err, the cumulative error doctrine does not apply.  *See People v. Krueger*, 2012 COA 80, ¶ 78.

## V.    Disposition

¶ 46    The judgment is affirmed.

JUDGE DUNN and JUDGE MOULTRIE concur.