2015 CO 15

**CANTINA GRILL, JV; Airport Lounges, LLC, a Colorado limited liability company; Dos Amigos Joint Venture, a Colorado joint venture; F & B Concessions, LLC, a Colorado limited liability company; Pour La France B; Pour La France T; and Skyport Companies, Inc., a Colorado corporation, Petitioners**

v.

**CITY & COUNTY OF DENVER COUNTY BOARD OF EQUALIZATION, BY AND THROUGH its members Cary KENNEDY, Chief Financial Officer, Adrienne Benavidez, Manager of General Services, Debra Johnson, Clerk and Recorder, Jose M. Cornejo, Manager of Public Works, and Chris Herndon, President of City Council; and Keith Erffmeyer, as County Assessor, City and County of Denver, Colorado, Respondents**

Supreme Court Case No. 12SC819

Supreme Court of Colorado.

March 16, 2015

Attorneys for Petitioners: Silver & DeBoskey, P.C., Richard S. Strauss, Denver, CO, Dean Neuwirth P.C., Dean Neuwirth, Denver, CO

Attorneys for Respondents: D. Scott Martinez, City Attorney, Mitchel Behr, Assistant City Attorney, Max Taylor, Assistant City Attorney, Denver, CO

JUSTICE MÁRQUEZ delivered the Opinion of the Court

¶ 1 We granted certiorari review to consider whether several food and beverage concessionaires at a city-owned airport hold taxable possessory interests under our three-prong test established in *Board of County Commissioners v. Vail Associates, Inc.*, 19 P.3d 1263 (Colo.2001). In *Vail Associates,* we held that a private possessory interest in tax-exempt

government property [1] is taxable if it exhibits significant incidents of private ownership that distinguish it from the government's underlying tax-exempt ownership. *Id.* at 1279. We articulated three factors demonstrating such incidents of private ownership: (1) whether the possessory interest provides a revenue-generating capability independent of the government property owner; (2) whether the possessory interest owner is able to exclude others from making the same use of the interest; and (3) whether the possessory interest is of sufficient duration to realize a private benefit therefrom. *Id.* In this case, we also granted review to consider whether the concessionaires' interests, if taxable, were properly valued under the possessory interest valuation provisions in section 39–1–103(17), C.R.S. (2014).

¶2 Relying on *Vail Associates*, the City and County of Denver ("City") assessed property taxes on the concessionaires' possessory interests in their airport concession spaces and valued those interests in accordance with section 39–1–103(17). The concessionaires protested the valuation and eventually filed suit in district court, arguing that their possessory interests do not meet the independence and exclusivity prongs of the *Vail Associates* test. The concessionaires also contested the City's valuation. The trial court ruled that the concessionaires' interests meet the *Vail Associates* test and adopted the valuation that the City presented at trial.

¶3 The court of appeals affirmed, concluding that the concessionaires' interests were taxable under *Vail Associates*. *Cantina Grill, JV v. City & Cnty. of Denver Bd. of Equalization*, 2012 COA 154, ¶¶ 28–42, 292 P.3d 1144, 1150–52. It reasoned that the

concessionaires could exclude others from using their particular concession spaces and that the concessionaires' revenue came from the traveling public, not the City. *Id.* The court of appeals also affirmed the trial court's adoption of the City's valuation. *Id.* at ¶¶ 43–54, 292 P.3d at 1152–53.

¶4 We affirm. We agree with the court of appeals that the concessionaires' possessory interests in their concession spaces are taxable interests under the three-factor test established in *Vail Associates*. The concessionaires' interests are sufficiently exclusive because the concessionaires have the right to exclude others from using their respective concession spaces to operate a concession business. In addition, the totality of the circumstances reflects that the concessionaires' revenue-generating capability is independent of the City. Finally, the City's valuation of the concessionaires' interests is consistent with the General Assembly's possessory interest valuation scheme set forth in section 39–1–103(17) and is supported by the record.

## I. Facts and Procedural History

¶5 The petitioners ("Concessionaires") are holders of possessory interests in real property owned by the City. Concessionaires operate eleven restaurants and lounges at Denver International Airport ("DIA"). The City owns the property and improvements at DIA. Because DIA is owned by the City, it is exempt from real property taxation. *See* Colo. Const. art. X, § 4.

¶6 Concessionaires obtained their possessory interests from the City through written

---

1. The State Division of Taxation defines a possessory interest in public property as: "A private property interest in government-owned property or the right to the occupancy and use of any benefit in government-owned property that has been granted under lease, permit, license, concession, contract, or other agreement." 3 *Assessor's Reference Library* 7.70 (rev. Mar. 2014). Because we rely on the Division's definition of "possessory interest" in the context of this case, we must analyze whether the particular "possessory interest" is sufficiently exclusive to determine whether it is taxable under *Vail Associates*. We note that, in the real property context, a

possessory interest necessarily connotes an interest that is exclusive. *Cf. Black's Law Dictionary* 1353 (10th ed. 2014) (defining possessory interest as "[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner"); *Restatement (First) of Prop.* § 7 (1936) (defining possessory interest as "a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of society in general from any present occupation of the land").

concession agreements.[2] The concession agreements grant Concessionaires the "right to occupy, improve, and use the Concession Space" for food and beverage services "consistent with and subject to all of the terms and provisions of [the] Agreement." Under the agreements, the City reserves the right to grant other concessionaires the right to sell food and beverages in other locations at DIA.

¶ 7 In consideration for the possessory interests granted under the agreements, Concessionaires pay the greater of either: (1) a defined percentage of their monthly gross revenues, which may fluctuate monthly or seasonally; or (2) a minimum monthly guarantee, which is calculated by applying a fixed price per square foot to the total square footage of the space exclusively possessed by the Concessionaire. The City has the authority to reestablish rentals, fees, and charges, provided that the adjustments are "nondiscriminatory and reasonable in relation to the cost of providing, operating, and maintaining property, services and facilities of the airport system." The concession agreements expressly provide that "the City shall not be construed or held to be a partner, associate, or joint venturer of Concessionaire in the conduct of its business."

¶ 8 Under the concession agreements, Concessionaires are required to supply sufficient goods and products to fully stock their concession spaces. Concessionaires are also responsible for the expenses associated with renovating their concession spaces; furnishing, installing, and maintaining ductwork and connections for heating and air conditioning, water, electricity, natural gas, and lighting; and providing janitorial and maintenance services for their concession spaces.

¶ 9 The concession agreements also impose certain operating restrictions on Concessionaires. For example, Concessionaires may use their concession spaces only for food and beverage services; they may not charge more than 110% of "street prices" charged in non-airport restaurants offering similar food and services in the Denver metropolitan area; they must obtain the City's approval to change their menus or prices, or to stay open fewer than sixteen hours per day; and they must require their officers, contractors, agents, and employees to comply with all airport security regulations adopted by the City. Testimony at trial indicated that these restrictions flow from Concessionaires' nontraditional location at the airport.

¶ 10 Beginning with the 2001 tax year, the City assessed Concessionaires' concession spaces as taxable possessory interests in tax-exempt property, relying on this court's opinion in *Board of County Commissioners v. Vail Associates, Inc.*, 19 P.3d 1263 (Colo. 2001). The City then valued those interests in accordance with section 39–1–103(17), C.R.S. (2014).

¶ 11 In July 2010, Concessionaires protested the notice of valuation regarding their concession spaces for that year and petitioned the City and County of Denver Board of Equalization to review the valuations. The Board denied Concessionaires' petitions, and Concessionaires sought review in district court under section 39–8–108, C.R.S. (2014).

¶ 12 The case proceeded to a trial de novo in June 2011, and the trial court issued a written ruling that largely affirmed the valuation.[3] Relevant here, the trial court concluded that Concessionaires' possessory interests in tax-exempt property were subject to taxation under this court's three-factor test set forth in *Vail Associates*. The trial court also adopted the valuation that the City presented at trial.

¶ 13 On appeal, Concessionaires challenged, among other things, the trial court's conclusion that their possessory interests are taxable under the independence and exclusivity prongs of the *Vail Associates* test. Concessionaires further argued that even if their interests are taxable, the trial court erred in

2. Although Concessionaires operate under separate concession agreements, they acknowledge that the agreements are virtually identical. Thus, we refer to the concession agreements collectively and quote the exemplar agreement submitted into evidence at trial as Exhibit 1.

3. The trial court did not affirm valuations for three specific locations that a representative of the City Assessor admitted at trial were improperly valued. The trial court adopted the City representative's amended valuation.

approving the City's valuation. The court of appeals affirmed, concluding that Concessionaires' possessory interests are sufficiently independent under the *Vail Associates* test because Concessionaires' source of revenue is the traveling public, not the City. *Cantina Grill*, ¶¶ 33–36, 292 P.3d at 1150–51. The court also concluded that Concessionaires' possessory interests meet the exclusivity factor of the *Vail Associates* test because Concessionaires can exclude others from using their particular concession spaces. *Id.* at ¶¶ 39–42, 292 P.3d at 1151–52. Finally, the court of appeals concluded that the record supported the trial court's adoption of the City's valuation. *Id.* at ¶ 54, 292 P.3d at 1153.

¶ 14 We granted Concessionaires' petition for a writ of certiorari to review the court of appeals' opinion regarding the taxability of Concessionaires' possessory interests under *Vail Associates* and the City's valuation of those interests under section 39–1–103(17).

## II. Standard of Review

¶ 15 An assessor's valuation of property for taxation is presumed to be correct. *Arapahoe Cnty. Bd. of Equalization v. Podoll*, 935 P.2d 14, 18 (Colo.1997). Thus, to rebut that presumption, a taxpayer who challenges an assessment bears the burden of proving, by a preponderance of the evidence, that the assessor's valuation is incorrect. *Bd. of Assessment Appeals v. Sampson*, 105 P.3d 198, 204 (Colo.2005). When a party appeals a taxing authority's decision to the district court, the court conducts a trial de novo and enters its own findings of fact and conclusions of law. § 39–8–108(1), C.R.S. (2014); *Podoll*, 935 P.2d at 18. Appellate courts review the district court's factual findings for an abuse of discretion and its legal conclusions de novo. § 39–8–108(3); *E-470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo.2000).

## III. Taxability of Concessionaires' Possessory Interests

¶ 16 The first issue in this case is whether Concessionaires' possessory interests in their concession spaces at DIA are taxable property even though the underlying real property is tax-exempt because it is owned by the City. We first discuss the principles that underlie taxation of possessory interests in tax-exempt property and relate these principles to the three-prong test set forth in *Board of County Commissioners v. Vail Associates, Inc.*, 19 P.3d 1263, 1275 (Colo.2001). We then apply the *Vail Associates* test to Concessionaires' possessory interests.

### A. The *Vail Associates* Test

¶ 17 The Colorado Constitution requires uniform taxation of all real and personal property unless article X specifically exempts the property from taxation. Colo. Const. art. X, § 3(1)(a) ("Each property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax."); *id.* § 6 ("All laws exempting from taxation property other than that specified in this article shall be void."); *see also Mesa Verde Co. v. Montezuma Cnty. Bd. of Equalization (Mesa Verde III)*, 898 P.2d 1, 7 (Colo.1995) ("[T]he general assembly may not exempt from taxation any property which is not specifically exempted in Article X of the Colorado Constitution."); *Denver Beechcraft, Inc. v. Bd. of Assessment Appeals of Colo.*, 681 P.2d 945, 948 (Colo. 1984) (same).[4]

¶ 18 Article X exempts certain classes of property from taxation, including, as relevant here, "property ... of the state, counties, cities, towns, and other municipal corporations and public libraries." Colo. Const. art. X, § 4. Although not listed in article X, we have also long recognized that "property owned by the United States government may not be subjected to state taxation under the Supremacy Clause of the United States Con-

---

4. Corporations and corporate property are expressly subject to taxation. *See* Colo. Const. art. X, § 9 ("The power to tax corporations and corporate property, real and personal, shall never be relinquished or suspended."); *id.* § 10 ("All corporations in this state, or doing business therein, shall be subject to taxation for state, county, school, municipal and other purposes, on the real and personal property owned or used by them within the territorial limits of the authority levying the tax.").

stitution." *Vail Assocs.*, 19 P.3d at 1271 (quoting *Mesa Verde III*, 898 P.2d at 7).

¶ 19 Colorado's property tax statutes likewise reflect that all real and personal property is taxable, except that exempted by law. Section 39–1–102(16), C.R.S. (2014), states that taxable property "means all property, real and personal, not expressly exempted from taxation by law." As relevant here, "real property" includes "[a]ll lands or *interests in lands*" and "[i]mprovements." § 39–1–102(14)(a), (c) (emphasis added). This statutory definition of "real property" has remained essentially unchanged for over a century. *See* ch. 3, sec. 13, 1901 Colo. Sess. Laws, 43, 45.

¶ 20 Generally, interests in real property that are less than fee ownership are assessed under the "unit assessment rule," a rule of property taxation that requires all estates in a unit of real property to be assessed together and the real estate, as an entirety, to be assessed to the owner of the fee. *City & Cnty. of Denver v. Bd. of Assessment Appeals*, 848 P.2d 355, 358 (Colo.1993).[5] The rule prohibits assessments on multiple taxpayers holding different interests in a single property. *See id.* at 359. Thus, where there are taxable interests in property that are less than fee ownership, such as a leasehold interest, "both the lessor's interest and the lessee's interest are assessed simultaneously," and the property is taxed to the fee owner "as though it was an unencumbered fee." *Id.* Under this method, "taxation of the whole is presumed to include taxation of the derivative parts, with the owner passing on the burden of taxation as the fee owner chooses." *Vail Assocs.*, 19 P.3d at 1278.

¶ 21 However, where the fee owner is the government and therefore not subject to taxation, "the unit assessment rule operates to tax the *private* ownership interest in the land and improvements together in the absence of a fee owner who pays the full taxes." *Id.* at 1279 (emphasis added). Section 39–1–107(4), C.R.S. (2014), now expressly provides that "[t]he property tax on a possessory interest in real or personal property that is exempt from taxation under this article shall be assessed to the holder of the possessory interest and collected in the same manner as property taxes assessed to owners of real or personal property." [6]

¶ 22 Our jurisprudence reflects that taxation of private possessory interests in government-owned land is both appropriate and required under article X of the Colorado Constitution and Colorado's property tax statutes where: (1) the private possessory interest is distinct from the government's ownership interest; and (2) taxation of the private interest does not effectively constitute a tax on the government's ownership interest.[7]

¶ 23 For example, in *Rummel v. Musgrave*, 142 Colo. 249, 350 P.2d 825 (1960), we held that a private possessory interest in producing uranium lands obtained under a lease with the United States was subject to taxation by the State. We first determined that "[t]he lease in question is separate property, vendible, subject to the consent of the lessor and inheritable." *Id.* at 826. Accordingly, the possessory interest was taxable unless the tax could be said to be upon the "separate and distinct ownership of the federal government." *Id.* Turning to whether taxation would be a tax on the government's

---

**5.** This rule is established by section 39–1–106, C.R.S. (2014), which provides that "[f]or purposes of property taxation, it shall make no difference that the use, possession, or ownership of any taxable property is qualified, limited, not the subject of alienation, or the subject of levy or distraint separately from the particular tax derivable therefrom."

**6.** The General Assembly added subsection (4) to section 39–1–107 after this court reiterated in *Vail Associates*, 19 P.3d at 1280, that possessory interests in otherwise tax-exempt property are taxable under the Colorado property tax scheme.

*See* ch. 268, sec. 3, § 39–1–107(4), 2002 Colo. Sess. Laws 1008, 1008–09.

**7.** Our prior cases in this area involved taxation of possessory interests in federal government-owned land. As noted above, the Supremacy Clause of the United States Constitution bars taxation of the federal government's ownership interest. *Mesa Verde III*, 898 P.2d at 8–9. The Colorado Constitution similarly bars taxation of "property ... of the state, counties, cities, towns, and other municipal corporations and public libraries." Colo. Const. art. X, § 4.

ownership interest, we concluded that "it is obvious that no burden is placed upon the United States Government in either a direct or indirect manner by the tax in question." *Id.* at 827. Thus, we concluded that the State had properly levied and collected taxes on the possessory interests held by the mining company.

¶ 24 Similarly, in *Mesa Verde Co. v. Board of County Commissioners (Mesa Verde I)*, 495 P.2d 229, 234 (Colo.1972), we held that a concessionaire's possessory interest in the improvements it constructed to conduct its services for the public at Mesa Verde National Park were taxable even though the federal government retained title to the improvements. We first ascertained the concessionaire's interest in the improvements by analyzing the concessionaire's contract with the government as well as the parties' actions under the contract. *Id.* at 232–33. We noted, for example, that the contract provisions revealed "the parties' intention to accord Mesa Verde Company a large amount of decisional authority and discretion with respect to its improvements," *id.* at 232, and that the concessionaire normally paid "the entire cost of constructing its improvements" and retained "all profits derived from its operations." *Id.* at 233. We concluded that the concessionaire's interests reflected "significant incidents of ownership." *Id.* at 233. As such, we determined that the concessionaire's interests were taxable. *See id.* We observed that strong policy considerations supported our decision to allow ad valorem taxation of the concessionaire's improvements, noting that "where a party has the right to possession, use, enjoyment, and profits of the property, that party should not be permitted to use the bare legal title of the Government to avoid his fair and just share of state taxation." *Id.*

¶ 25 After we decided *Mesa Verde I*, the General Assembly enacted a statute exempting certain private possessory interests from taxation, including interests in federal park land obtained under a lease or concession agreement. *See Mesa Verde III*, 898 P.2d at

6–7 (citing § 39–3–135(4)(c), C.R.S. (1994)). Despite this provision, the Montezuma County Assessor assessed Mesa Verde Company's use of, and possessory interest in, federal land for its concession at Mesa Verde National Park. *Id.* at 2.[8] Mesa Verde challenged the assessment, contending it was exempt from property tax under the statute. The County argued that, to the extent the statute created an exemption for Mesa Verde's possessory interest, it violated article X of the Colorado Constitution. *Id.* at 3. We agreed.

¶ 26 We determined that Mesa Verde's possessory rights under its concession agreement were "interest[s] in land" and "real property," and thus taxable under article X and the General Assembly's definition of taxable property in section 39–1–102(16). *Id.* at 4–5. We then held that the statute exempting such possessory interests from taxation was unconstitutional because "the general assembly may not exempt from taxation any property which is not specifically exempted in Article X of the Colorado Constitution." *Id.* at 7. Finally, we held that state taxation of such possessory interests did not violate the Supremacy Clause because "the federal government's constitutional immunity from state taxation is not infringed when a state imposes a tax on private corporations and they are entities independent of the United States using property in connection with their own commercial activities for profit-making." *Id.* at 9.

¶ 27 In 1996, in response to *Mesa Verde III*, the General Assembly again sought to exempt certain possessory interests from taxation. The General Assembly enacted section 39–3–136, declaring that certain possessory interests in tax-exempt property "shall not be subject to property taxation unless specific statutory provisions have been enacted that direct the taxation of such possessory interests." *Vail Assocs.*, 19 P.3d at 1272 (citing § 39–3–136(2), C.R.S. (2000)). Around the time of this enactment, the Eagle County Assessor assessed Vail Associates, Inc.'s possessory interests in land obtained under a special use permit from the U.S.

---

8. Thus, whereas *Mesa Verde I* concerned the concessionaire's possessory interest in the *improvements* it had constructed to perform its services,

*Mesa Verde III* concerned the concessionaire's possessory interest in the real property (federal land) it occupied and used for its concession.

Forest Service. The permit entitled Vail to occupy, use, and enjoy 12,590 acres of national forest land to operate the Vail ski resort. *Id.* at 1267. Vail challenged Eagle County's assessment on the grounds that its possessory interest was exempt from taxation under section 39–3–136. *Id.* at 1267–68. In *Vail Associates,* we ultimately held that this legislation unconstitutionally exempted some private possessory interests in tax-exempt property from taxation, contrary to article X and our decision in *Mesa Verde III. Id.* at 1267.

¶ 28 We observed that "the principal design of the constitution's revenue provisions is to subject all private real and personal property to the payment of its fair proportion of taxation necessary for governmental purposes, unless the property falls within a constitutionally stated category of exemption." *Id.* at 1273. We also observed that the 1996 amendments to the property tax statutes did not alter the longstanding statutory definition of "real property" in section 39–1–102(14)(a), or otherwise redefine real or personal property to exclude possessory interests. *Id.* at 1275. We concluded that the statutory provision instead improperly exempted certain possessory interests from taxation in violation of the Colorado Constitution's requirement in article X that all real and personal property be taxed. *Id.* at 1278.

¶ 29 After concluding that the exemption in section 39–3–136 was unconstitutional, we discussed the necessary requirements for lawful taxation of a private possessory interest in tax-exempt government property. *Id.* at 1278–79. Drawing from our prior cases, we determined that "for taxation to occur, the possessory interest in tax-exempt property must exhibit significant incidents of private ownership that distinguish it from the underlying tax-exempt ownership." *Id.* at 1279. This is because the taxation of private possessory interests in government lands—which is permissible—must be distinguished from taxation of the government's underlying ownership of the land. *Id.* at 1278. We then articulated three factors demonstrating such incidents of private ownership: (1) whether the possessory interest provides a revenue-generating capability independent of the government property owner; (2) whether the

possessory interest owner can exclude others from making the same use of the interest; and (3) whether the possessory interest is of sufficient duration to realize a private benefit therefrom. *Id.* at 1279.

¶ 30 Finally, applying this three-factor test, we concluded that Vail's possessory interest under the special use permit was real property taxable under article X because Vail "owns a significant ownership interest in federal property from which it derives revenues for private benefit; it can exclude others from using the federal property it occupies for the same use, and its interest extends to the year 2031, a significant period of time for realizing its private benefit." *Id.* at 1280.

¶ 31 In sum, Colorado's constitution and property tax statutes reflect that all real and personal property is taxable, except for property that is expressly exempted from taxation by law. Colo. Const. art. X, §§ 3(1)(a), 4, 6, 9, 10; § 39–1–102(16). Moreover, Colorado property tax statutes have long defined "real property" to include "interests in land" and "[i]mprovements." § 39–1–102(14)(a), (c). Our case law reflects that a possessory interest in tax-exempt property is taxable where the interest exhibits significant incidents of private ownership that distinguish it from the underlying government ownership. The factors demonstrating significant incidents of private ownership ensure that the interest is indeed a taxable property interest under article X of the Colorado Constitution and the property tax statutes and, importantly, that taxation of the interest does not effectively constitute a tax on the government's underlying ownership interest.

## B. Application

¶ 32 Concessionaires' written concession agreements grant them the "right to occupy, improve, and use" their respective concession spaces for food and beverage services "consistent with and subject to all of the terms and provisions of [the] Agreement." Concessionaires contend that their possessory interests in concession spaces at DIA are not taxable under the first two factors of this court's test in *Vail Associates.* Specifically, Concessionaires contend that: (1) their use and possession of the concession spaces are

not sufficiently exclusive; and (2) their revenue-generating capability is not independent of the City.

### 1. Exclusivity

¶ 33 Concessionaires argue that their use is not exclusive because the concession agreements permit the City to grant other concessionaires the right to operate restaurants and sell food and beverages in *other locations* at DIA. We disagree.

¶ 34 The exclusivity factor of the *Vail Associates* test ensures that the interest to be taxed is indeed a property interest that is taxable under article X and the revenue statutes. To be taxable under article X of the Colorado Constitution, the possessory interest must be sufficiently exclusive to qualify as a real property interest as defined under the revenue statutes. In *Vail Associates*, we indicated that the exclusivity prong turns on "the ability of the possessory interest owner to exclude others from making the same use of the interest." 19 P.3d at 1279. We noted that although some degree of exclusivity is required for possessory interest taxation, "neither absolute control nor absolute exclusivity is required." *Id.* at 1279 n. 21 (quoting *Power Res. Coop. v. Dep't of Revenue*, 330 Or. 24, 996 P.2d 969, 973 (2000)). We also noted that "concurrent uses of property are not necessarily inconsistent with exclusivity." *Id.* (citing *City of San Jose v. Carlson*, 57 Cal.App.4th 1348, 67 Cal. Rptr.2d 719, 725 (1997); *Scott–Free River Expeditions, Inc. v. Cnty. of El Dorado*, 203 Cal.App.3d 896, 250 Cal.Rptr. 504, 508 (1988)). Therefore, we determined that even though Vail was operating under a special use permit that reserved the right of the Forest Service to allow uses by others that did not materially interfere with the ski resort's uses under its permit, its interest was sufficiently exclusive because the ski resort could "exclude others from using the federal property it occupie[d] for the same use." *Id.* at 1266, 1280.

¶ 35 Importantly, our analysis in *Vail Associates* focused on whether the ski resort's

use of the *particular area it occupied* was sufficiently exclusive. In other words, our inquiry regarding exclusivity did not turn on whether the Forest Service leased lands to other ski resorts on nearby government land.

¶ 36 Case law in the real property context supports the notion that exclusivity refers to the interest holder's ability to exclude others from the same use of the particular area it occupies.[9] In *Bernhardt v. Hemphill*, 878 P.2d 107, 113 (Colo.App.1994), the court of appeals analyzed whether a real property interest was created through a time-share contract. In its analysis, the court of appeals focused on whether the contract entitled the time-share owner to the exclusive use of any particular unit. *Id.* The court of appeals held that the time-share contract did not transfer a real property interest because it did not provide the right to reserve "any particular unit, for any particular annual period." *Id.* In contrast, a "time-span estate," which is legislatively recognized as a distinct interest in real property, includes, among other requirements, "[a]n exclusive right to possession and occupancy of the unit during an annually recurring period of time." § 38–33–110(8)(b), C.R.S. (2014); *see Bd. of Cnty. Comm'rs v. Colo. Bd. of Assessment Appeals*, 628 P.2d 156, 158 (Colo.App.1981) (stating that section 38–33–110 is "a legislative recognition of the time share estate as a distinct interest in real property").

¶ 37 In this case, the concession agreements and testimony at trial established that each Concessionaire has the right to exclude others from using that Concessionaire's particular concession space to operate a concession business. The concession agreements grant Concessionaires the "right to occupy, improve, and use the Concession Space consistent with and subject to all of the terms and provisions of [the] Agreement." Nothing in the concession agreements allows the City to permit a second concessionaire the right to operate out of an existing Concessionaire's location. Indeed, Concessionaires' witness, who is a managing member of all the concessions at issue in this case, admitted at

---

9. Because the revenue statutes define "real property" as including "[a]ll lands or interests in lands" and "[i]mprovements," § 39–1–102(14), we determine that our case law defining real property in other contexts is also illuminating on the issue of exclusivity.

trial that only the particular Concessionaire "has the right to occupy, use, improve, and generate revenue from that concession space." Based on the concession agreements and testimony at trial, the trial court found that "[n]o other concessionaires have the right to use the [Concessionaires'] concession spaces," and "the City does not permit anyone else to use those particular concession spaces to operate a business[ ]."

¶ 38 Concessionaires point to language in the concession agreements to argue that their interests are not exclusive:

City reserves the right to grant to other concessionaires the right to operate restaurants and sell food and beverages in *other locations* in the Airport, and *Concessionaire understands and agrees that its right to the permitted uses is not exclusive.*

(Emphasis added.) Testimony at trial established that under this provision, the City has permitted Concessionaires' direct competitors to operate in areas near Concessionaires' existing spaces.

¶ 39 We disagree that this language in the agreements is fatal to the taxability of Concessionaires' interests. The provision permits the City to enter into agreements with other concessionaires to sell food and beverages at *other locations* at DIA. It does not permit the City to allow a second concessionaire to operate a concession out of an existing Concessionaire's location. Because the exclusivity factor focuses on whether the interest holder's use of a *particular area* it occupies is sufficiently exclusive, the interest holder's inability to exclude competition from *other locations* is not probative of exclusivity. Therefore, we find Concessionaires' reliance on this provision unpersuasive.

¶ 40 In sum, the exclusivity factor in this case is met because Concessionaires have the right to exclude others from using each of their concession spaces to operate a concession business. That a competitor may operate a concession at a nearby location has no bearing on this factor.

## 2. Independence

¶ 41 Concessionaires argue that their revenue-generating capability is not in-

dependent of the City because of the extensive operating restrictions imposed on them under their concession agreements. The court of appeals rejected this argument, concluding that the independence prong of *Vail Associates* turns not on the level of control exercised by the government owner, but instead on the source of the possessory interest holder's revenue and, more specifically, whether the government owner is the only or the dominant source of that revenue. *Cantina Grill*, ¶ 33, 292 P.3d at 1150–51. We disagree with the court of appeals that operating restrictions are irrelevant to the independence inquiry. *See id.* at ¶ 35, 292 P.3d at 1151. However, we conclude that the City's operating restrictions in this case do not deprive Concessionaires of the independent revenue-generating capability of their concession spaces.

¶ 42 As discussed above, in considering the taxability of private possessory interests in tax-exempt land, care must be taken to ensure that the tax is indeed imposed on a private interest, rather than on the underlying government-owned property. Thus, a possessory interest is taxable only if "it provides a revenue-generating capability to the private owner *independent* of the government property owner." *Vail Assocs.*, 19 P.3d at 1279 (emphasis added). This factor ensures that the tax falls on the private interest, as distinguished from the government. *See id.*

¶ 43 In *Vail Associates*, we concluded that "Vail owns a significant ownership interest in federal property from which it derives revenues for private benefit." *Id.* at 1280. Although this statement acknowledged Vail's "revenue-generating capability," it did not analyze the requisite degree of "independence" from the government property owner. We discussed neither the source of the ski resort's revenues nor any restrictions the government placed on the resort's operations.

¶ 44 Because *Vail Associates* does not further define the independence factor, we look to other Colorado case law for additional guidance. This case law demonstrates that the degree of control exercised by the possessory interest holder, not merely its source of revenue, is relevant to determining

whether the possessory interest holder's revenue-generating capability is sufficiently independent from the government.

¶ 45 In *Mesa Verde I*, we upheld a property tax on improvements located on federally owned property used by Mesa Verde Company, a private concessionaire. 495 P.2d at 234. In upholding the tax, we emphasized that the contractual provisions reflected the parties' intent to accord Mesa Verde "a large amount of decisional authority and discretion with respect to its improvements." *Id.* at 232. We observed, for example, that Mesa Verde had authority, subject to the government's approval, to build improvements; to transfer, assign, encumber, or mortgage its possessory interest; and to charge the public appropriate rates in connection with its use. *Id.* We further observed that Mesa Verde was contractually required to provide all necessary maintenance and repairs on the improvements. *Id.*

¶ 46 By contrast, the concessionaire in *Southern Cafeteria, Inc. v. Property Tax Administrator* lacked sufficient independence from the federal government. 677 P.2d 362, 364–65 (Colo.App.1983). In that case, Southern Cafeteria provided food service at the Denver Federal Center under a General Services Administration contract. *Id.* at 363. The court of appeals distinguished Southern Cafeteria's interest from the concessionaire's interest in *Mesa Verde I*. Under Southern Cafeteria's contract, the federal government provided essentially all of the equipment necessary for the operation. *Id.* The government also maintained and repaired the building structures. *Id.* at 365. Finally, the government also controlled the pricing structure and fixed the amount of profit the cafeteria could realize. *Id.* at 363, 365. Under these circumstances, the court of appeals determined that Southern Cafeteria was not independent of the federal government and its interest under its concession agreement was not taxable. *Id.* at 365. Importantly, the court of appeals rejected the property tax administrator's argument that the assessment was lawful because Southern

Cafeteria was not paid a fee but instead operated cafeterias and snack bars for a profit, meaning that its revenues did not come directly from the government. The court focused not on the source of the revenue but on the concessionaire's lack of independence, finding no distinction between the government "paying [a contractor] a fixed profit and fixing a ceiling on Southern Cafeteria's profits on its own operation." *Id.*

¶ 47 The principles embodied in *Mesa Verde I* and *Southern Cafeteria* are reflected in section 39–1–103(17)(a)(III), C.R.S. (2014), which excludes management contracts from possessory interest taxation. Under section 39–1–103(17)(a)(III), the source of revenue is not dispositive as to whether a government contractor is statutorily exempt from possessory interest taxation. Rather, the exemption may apply either where the contractor operates the government's property for a fee, or where the government controls the amount of profit the contractor can realize or sets the prices charged by the contractor. § 39–1–103(17)(a)(III)(C). This section also sets forth additional criteria, namely: (1) whether the government provides all funds to operate the property; (2) whether the government owns all of the property used in the operation of the property subject to the contract; (3) whether the government reserves the right to use the property; (4) whether the property is maintained and repaired at the expense of the government; and (5) whether the management contractor has no leasehold or similar interest in the property.[10] § 39–1–103(17)(a)(III)(A), (B), (D), (E), (G).

¶ 48 Finally, case law we relied upon in *Vail Associates* in articulating the three-factor test supports the notion that the independence inquiry does not turn on the source of revenue alone. For instance, in California, the independence factor is "measured by the amount of routine control and supervision enjoyed by the user, with the recognition that the government owner necessarily retains ultimate control." *City of San Jose*, 67 Cal.Rptr.2d at 723 (internal quotation marks

10. Where the contractor uses the government property for a manufacturing process, section 39–1–103(17)(a)(III)(F) provides that whether the government owns all or substantially all of the personal property used in the process is also relevant.

and citations omitted); *see also* Cal. Rev. & Tax Code § 107(a)(1) (defining independent as "the ability to exercise authority and exert control over the management or operation of the property or improvements"), *cited in Vail Assocs.*, 19 P.3d at 1279 n.21. If the government owner retains sufficient control, "the user may be considered to be an agent, and the [government's] immunity from taxation extends to the user." *City of San Jose*, 67 Cal.Rptr.2d at 723 (citations omitted). This agency approach is consistent with the United States Supreme Court's view that the Supremacy Clause bars taxation where "the levy falls on the [federal government] itself, or on an agency or instrumentality so closely connected to the Government that the two cannot be realistically viewed as separate entities, at least insofar as the activity being taxed is concerned." *United States v. New Mexico*, 455 U.S. 720, 735, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982).

¶ 49 Thus, the independence factor, first articulated in *Vail Associates*, does not focus solely on the interest holder's source of the revenue. Instead, we look to the totality of the circumstances to determine whether an interest holder's revenue-generating capability is truly independent from the government, or whether the interest holder is merely an agent of the government, such that any tax on the interest holder would be a tax on the government. These circumstances include, but are not limited to: (1) whether the government pays a fee to the interest holder for its operation of the property in question; (2) whether the government controls the prices the interest holder can charge or restricts the profits the interest holder can generate; (3) whether the interest holder provides the supplies, equipment, and improvements necessary for the operation of the property; (4) whether the interest holder is responsible for the expense of maintaining and repairing the property; and (5) whether the interest holder has sufficient control and supervision of its operation.[11] *See Mesa Verde I*, 495 P.2d at 232; *Southern Cafeteria*,

677 P.2d at 363–65; *see also* § 39–1–103(17)(a)(III).

¶ 50 Applying this test to the facts here, we conclude that Concessionaires' revenue-generating capability is sufficiently independent from the City that the independence factor is met.

¶ 51 First, Concessionaires' revenue comes from the traveling public, and, in contrast to *Southern Cafeteria*, the City does control the amount of profit that Concessionaires can make. Concessionaires can set their own prices, subject to the City's approval. Although the City restricts the prices to a maximum of 110% of "street prices," this restriction protects the traveling public from price-gouging; its purpose is not to control Concessionaires' profit.

¶ 52 Second, Concessionaires are responsible for the cost of supplies, equipment, and improvements for the operation of their concession spaces. The concession agreements require Concessionaires to "supply sufficient goods and products to fully stock [their] concession spaces." Concessionaires are also required by the agreements to install a water meter, electric meter, and gas meter, if required, at Concessionaires' expense. Finally, the concession agreements require Concessionaires to renovate their concession spaces at their "sole cost and expense." Such renovations include furniture, fixtures, and equipment. Though the improvements affixed to the realty become property of the City, private commercial leases similarly vest ownership of the improvements in the lessor upon termination. *See, e.g., Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1022 (Colo.App. 2005) (evaluating a lease that required lessee to construct building and that vested ownership in lessor upon termination).

¶ 53 Third, Concessionaires are responsible for the expense of maintaining and repairing their concession spaces. The concession agreements provide that Concessionaires are responsible for the expense of janitorial services and maintenance for the concession

---

11. We emphasize that a possessory interest is not taxable just because the interest holder has *any* revenue-generating capability independent of the government. Courts should apply the multi-factor test we lay out here to determine whether, under the totality of the circumstances, an interest holder's revenue-generating capability is truly independent from the government.

spaces, including redecoration, painting, and repair and replacement of the worn furnishings. Moreover, Concessionaires are responsible for casualty loss of the improvements, as provided by the concession agreements.

¶ 54 Finally, while the City imposes operating restrictions related to some aspects of Concessionaires' operations, such as the price of their products, hours of operation, and menus, these operating restrictions do not deprive Concessionaires of control and supervision of their operations. *Cf. United States v. Colorado*, 460 F.Supp. 1184, 1186 (D.Colo. 1978) (noting that the government contractor's "entire role or relationship" to the property it managed was defined by contract), *aff'd*, 627 F.2d 217 (10th Cir.1980), *cited in Vail Assocs.*, 19 P.3d at 1279. Nor do the operating restrictions in this case convert Concessionaires into agents or partners of the City. Importantly, the concession agreements provide that "it is expressly understood and agreed that the City shall not be construed or held to be a partner, associate, or joint venture of Concessionaire." Moreover, many of the terms concerning hours of operation and menus may be modified with the consent of the City. Concessionaires may even assign their concession agreements with City approval. This is similar to *Mesa Verde I*, where many of the concessionaire's actions were subject to the government's prior approval. 495 P.2d at 232. That the City maintains ultimate control over some aspects of Concessionaires' operations is not dispositive because "[t]he governmental body that contracted with the user has the responsibility to safeguard the use of public property, and would be remiss if it did not retain ultimate control over such use, by grantees as well as by the public." *City of San Jose,*

67 Cal.Rptr.2d at 725 (internal quotation marks and citations omitted).

¶ 55 In sum, although we disagree with the court of appeals that operating restrictions are not relevant to the independence prong, we conclude that the independence factor is met in this case because the totality of the circumstances indicates that Concessionaires' revenue-generating capability is independent from the City, such that Concessionaires are not merely the City's agents, and a tax on Concessionaires' possessory interest would not be effectively a tax on the government.

### C. Conclusion

¶ 56 Because Concessionaires' interests are sufficiently exclusive and independent, and Concessionaires do not dispute that their interests are of sufficient duration, we conclude that Concessionaires' interests exhibit significant incidents of ownership under the *Vail Associates* test. Therefore, Concessionaires' possessory interests are taxable property under article X of the Colorado Constitution and the revenue statutes, even though the underlying government-owned land is tax-exempt.

### IV. Valuation of Concessionaires' Possessory Interests

¶ 57 Concessionaires also contend that the trial court erred in approving the City's valuation of their possessory interests. Specifically, Concessionaires dispute the determination of their "reasonably estimated future annual rents," and they also argue that portions of their future rent should have been excluded from the valuation.

¶ 58 As relevant here, section 39–1–103(17), C.R.S. (2014),[12] sets forth a two-step method for the valuation of taxable possessory interests in tax-exempt properties.[13]

---

12. In enacting section 39–1–103(17), the General Assembly provided that it would become effective only if this court determined that the Colorado Constitution requires taxation of possessory interests in tax-exempt property. Ch. 297, sec. 4, § 39–1–103(17), 1996 Colo. Sess. Laws 1849, 1852. Thus, section 39–1–103(17) became effective in 2001 when this court held in *Vail Associates* that the Colorado Constitution requires taxation of possessory interests in tax-exempt property.

13. This two-step methodology applies where the cost or income approach to appraisal is utilized. Section 39–1–103(17)(a)(II)(A) provides that "the actual value of a possessory interest ... shall be determined by appropriate consideration of the cost approach, the market approach, and the income approach to appraisal." The trial court found that the assessor appropriately considered the market approach for the purposes of this provision, but determined that the unique market at DIA and the unique circumstances of the lease made the market approach inappropriate. This

First, to calculate the actual value of the possessory interest, the assessor must calculate the "present value of the reasonably estimated future annual rents or fees required to be paid by the holder of the possessory interest to the owner of the underlying real or personal property." § 39–1–103(17)(a)(II)(A). The "rents or fees" under this provision shall be the "actual contract rents or fees reasonably expected to be paid ... unless it is shown that the actual contract rents or fees to be paid ... are not representative of the market rents or fees paid for that type of real or personal property." *Id.* Second, the assessor shall exclude rent and fees required to be paid for all rights other than the exclusive right to use and possess the property. § 39–1–103(17)(a)(II)(B). Relevant here, the statute indicates that the following are examples of such payments that shall be excluded: (1) "[n]onexclusive rights to use and possess ... common areas"; (2) "rights to conduct a business"; and (3) "reimbursement ... of the reasonable costs of operating, maintaining, and repairing the land, improvements, or personal property to which the possessory interest pertains, regardless of whether such costs are separately stated, provided that the types of such costs can be identified with reasonable certainty from the documents granting the possessory interest." *Id.*

¶ 59 At trial, a representative of the City's assessor, qualified as an expert in valuation, testified that he used the minimum monthly guarantee as the basis to determine the "reasonably estimated future annual rents." Under the concession agreements, Concessionaires pay the greater of either: (1) a defined percentage of their monthly gross revenues, which may fluctuate monthly or seasonally; or (2) a minimum monthly guarantee, which is calculated by applying a fixed price per square foot to the total square footage of the space exclusively possessed by the Concessionaire. The representative testified that he used the minimum monthly guarantee instead of the percentage of monthly gross revenues because, regardless of circumstances, Concessionaires would pay at least the minimum monthly guarantee in the fu-

ture. The representative also determined that the only qualifying deduction or exclusion required under section 39–1–103(17)(a)(II)(B) was the value of Concessionaires' non-exclusive occupancy of the common areas, like food court spaces. It was undisputed that the assessor excluded all rent that would be paid for common areas. The trial court ultimately adopted the representative's valuations of Concessionaires' possessory interests.

### A. Reasonably Estimated Future Annual Rents or Fees

¶ 60 Concessionaires contend that the use of the minimum monthly guarantee was not an appropriate basis for determining the "reasonably estimated future annual rents or fees" under section 39–1–103(17). Section 39–1–103(17)(a)(II)(A) provides that the "reasonably estimated future annual rents or fees" are the "actual contract rents or fees reasonably expected to be paid" unless it is "shown" that they "are not representative of the market rents or fees paid for that type of real or personal property." Concessionaires argue that the minimum monthly guarantee was neither the "actual contract rent ... expected to be paid" nor was it "representative of market rents."

¶ 61 First, Concessionaires argue that the minimum monthly guarantee was not representative of the "actual contract rents or fees reasonably expected to be paid" because most Concessionaires historically paid the percentage of monthly gross revenues instead of minimum monthly guarantee. However, the representative's use of the minimum monthly guarantee, approved by the trial court, was a *reasonable* estimate of future rent because Concessionaires are obligated under their concession agreements to pay *at least* that amount. Though it also may have been reasonable for an assessor to estimate future rent based on historical payments of a percentage of monthly gross revenues, Concessionaires have not met their burden to prove that the use of the minimum monthly guarantee was an unreasonable esti-

particular finding is undisputed. Therefore, because the market approach is not appropriate,

the provisions governing the cost and income approach are applicable.

mate of future rent under their concession agreements. *See Bd. of Assessment Appeals v. Sampson,* 105 P.3d 198, 204 (Colo.2005) (the taxpayer has the burden to show by a preponderance of the evidence that the valuations are incorrect).

¶ 62 Regardless, Concessionaires contend that the trial court erred in adopting the representative's valuation because the representative did not consider whether minimum monthly guarantee was "representative of the market rents" for similar property. However, the trial court found, and the record supports, that the representative *did* inquire into the market rate—but determined that the only comparable market consisted of the concessions at DIA.

¶ 63 Thus, the trial court's adoption of the representative's use of the minimum monthly guarantee as a basis for determining the "reasonably estimated future annual rents or fees" is consistent with section 39–1–103(17) and is supported by the record.

### B. Exclusions

¶ 64 Concessionaires also contend that the valuation does not exclude portions of future rent that are for payments not associated with their exclusive use and occupancy of their concession spaces. Specifically, Concessionaires contend that a portion of their future rent should be excluded under section 39–1–103(17)(a)(II)(B) as payments for the right to conduct a business and as "reimbursements" to the City for the costs of operating and maintaining the airport. We disagree.

¶ 65 The concession agreements state that the "compensation" due under the agreements is "for the rights and privileges herein granted by the City." The rights granted under the agreements are "the right to occupy, improve, and use the Concession Space." Together, these provisions indicate that the rent (or compensation) due under the agreements is for the right to occupy, improve, and use the concession spaces—not for the right to conduct a business or for reimbursements for operating expenses.

¶ 66 Still, Concessionaires contend that a portion of their future rent should be excluded as a payment for the right to conduct a business. Section 39–1–103(17)(a)(II)(B) clarifies that excludable rent for the right to conduct a business should be determined in accordance with guidelines published by the administrator—which are contained in the Assessor's Reference Library ("ARL"). In providing guidance on calculating exclusions from future rent, the ARL recognizes that possessory interest agreements are usually structured in such a way that the rent due under the agreement already "reflect[s] amounts *after expenses and income exclusions are taken into account,"* and, thus, no exclusion under section 39–1–103(17)(a)(II)(B) is usually necessary. 3 *Assessor's Reference Library* 7.78 (rev. Mar. 2014) (emphasis in original). However, exclusions may be necessary when the rent due under the agreement is based on a percentage of revenue, i.e. percentage rent. *Id.* When percentage rent is used as the basis to calculate future rent, the ARL instructs assessors to compare the percentage rent to market rent to determine the amount attributable to business value. *Id.* at 7.79. Where percentage rent is higher than market rent, the difference should be excluded as rent for the right to conduct a business. *Id.*

¶ 67 In this case, the representative used the minimum monthly guarantee—not a percentage of monthly gross revenues—as the basis to value Concessionaires' possessory interests. Consistent with the ARL guidelines, the representative testified that by using the minimum annual guarantee, he was certain that he had not captured any value for the right to conduct a business. Moreover, the representative also testified that the minimum monthly guarantee was representative of market rent. Thus, evidence presented at trial supports his assertion that no portion of that rent was attributable to payments for the right to conduct a business because the minimum monthly guarantee and market rent are essentially the same. We therefore conclude that the trial court did not err in adopting the representative's valuation that did not exclude any portion of future rent as a payment for the right to conduct a business.

¶ 68 Finally, Concessionaires argue that a portion of future rent is for "reimbursements" to the City for the costs of operating and maintaining the airport. Section 39–1–103(17)(a)(II)(B) requires an appraiser to exclude from valuation any fees that will be paid as "reimbursement to the owner of the underlying real or personal property of the reasonable costs of operating, maintaining, and repairing the land, improvements, or personal property to which the possessory interest pertains." Such deductions, however, apply only where "the types of such costs can be identified with reasonable certainty from the documents granting the possessory interest." *Id.*

¶ 69 As Concessionaires conceded at trial, nothing in the concession agreements specifically identifies any reimbursement to the City for the costs of "operating, maintaining, or repairing" the airport. In fact, the concession agreements provide that the City shall maintain the terminal and concourses *at its expense.*

¶ 70 Nonetheless, Concessionaires argue that because the City can reestablish the minimum monthly guarantee under the concession agreements in reasonable relation to the cost of providing, operating, and maintaining the airport, such increases are "reimbursements" for operating expenses. In support of this argument, Concessionaires rely on several letters from the City notifying them of such increases. The letters indicate that increases in facility costs contributed to these increases. However, the trial court found that the "percentage increases of facility costs bear no obvious relation to the percentage increases in the minimum guaranteed amounts." More importantly, nowhere do the concession agreements indicate that any portion of payment, including that attributed to a payment increase, constitutes a reimbursement to the City. Any City use of payments from Concessionaires to operate, maintain, and repair the airport does not transform such payment—which the concession agreements state is for the "right to occupy, improve and use the Concession Space"—into a reimbursement for operating and maintaining the airport.

¶ 71 Therefore, we reject Concessionaires' contention that some of their payment is excludable either as payment for the right to conduct a business or reimbursement to the City for operating expenses. The trial court's adoption of the City's valuation is consistent with section 39–1–103(17)(a)(II)(B) and the administrator's guidance in the ARL and is supported by the record.

## V. Conclusion

¶ 72 We hold that Concessionaires' possessory interests in their concession spaces are taxable interests under article X of the Colorado Constitution and the property tax statutes because Concessionaires' possessory interests meet the three-prong test established in *Vail Associates.* We conclude that Concessionaires' interests are sufficiently exclusive because Concessionaires have the right to exclude others from their concession spaces to operate a concession business. Moreover, we conclude that the totality of the circumstances indicates that Concessionaires' revenue-generating capability is independent of the City.

¶ 73 We also hold that the trial court's adoption of the City's valuation is consistent with the General Assembly's possessory interest valuation scheme set forth in section 39–1–103(17), C.R.S. (2014), and is supported by the record. Accordingly, we affirm the judgment of the court of appeals, albeit on slightly different grounds.

JUSTICE BOATRIGHT concurs in part and dissents in part.

JUSTICE EID dissents, and JUSTICE COATS joins in the dissent.

JUSTICE BOATRIGHT, concurring in part and dissenting in part.

¶ 74 I agree with the majority that the concessionaires' possessory interests satisfy the tripartite test for taxation announced in *Board of County Commissioners v. Vail Associates, Inc.*, 19 P.3d 1263 (Colo.2001). Yet I disagree with the majority's conclusion that the City properly valued the concessionaires' interests for property tax purposes. In my view, the City's "mass appraisal" approach clashes with the statutory command to esti-

mate the present value of future payments due under each concessionaire's contract. *See* § 39–1–103(17)(a)(II)(A), C.R.S. (2014). Hence, I concur with the conclusion in Part III of the majority's opinion but respectfully dissent from Part IV.

¶ 75 By holding that the Colorado Constitution requires the taxation of possessory interests in tax-exempt property that exhibit "significant incidents of ownership," *Vail Associates* carried the legislature's possessory interest taxation scheme into effect. 19 P.3d at 1280; ch. 297, sec. 4, § 39–1–103(17), 1996 Colo. Sess. Laws 1849, 1852 (providing a method for the valuation of possessory interests in tax-exempt land "if the Colorado supreme court holds that the Colorado constitution requires" such taxation). That taxation scheme is embodied in section 39–1–103(17), C.R.S. (2014). Section 103(17)(a) begins with the observation that "the valuation of possessory interests in exempt properties is uncertain and highly speculative." It then sets forth specific standards to allay the risk of unequal valuations. *Id.* The Assessor's Reference Library (ARL) fleshes these standards out with guidelines that are binding on all assessors. *Huddleston v. Bd. of Equalization,* 913 P.2d 15, 18 (Colo.1996). This case is our first opportunity to interpret the legislative scheme.

¶ 76 As the majority explains, section 39–1–103(17)(a)(II) prescribes a two-step method for the valuation of possessory interests under the cost or income approach to appraisal. The assessor must first determine "the present value of the reasonably estimated future annual rents or fees required to be paid" under the contract. § 39–1–103(17)(a)(II)(A). The assessor should use "the actual contract rents or fees reasonably expected to be paid ... unless it is shown" that these "are not representative of the market rents or fees paid for that type of real or personal property, in which case the market rents or fees" should be substituted. *Id.* Pursuant to section 103(17)(a)(II)(B), the assessor then subtracts any amounts "paid for all rights other than the exclusive right to use and possess the ... property." For contracts that define rent as a percentage of revenue, the ARL recommends that the assessor compile cur-

rent market rates for comparable properties. 3 *Assessor's Reference Library* 7.79 (rev. Mar. 2014). If the percentage amount is higher, the ARL suggests that the difference should be excluded as the value of the business, as opposed to the value of the property. *Id.* In other words, the ARL bases the value of the possessory interest on the market rent whenever that value differs from actual rent.

¶ 77 The City calculated the present value of the concessionaires' interests using the minimum monthly guaranteed rent described in the concession agreements—$56 per square foot for most. The City's valuation expert testified that this value was a reasonable approximation of future payments because it was the rent floor set by the agreements. Although most concessionaires paid a higher amount equal to a percentage of their monthly gross revenues, none would ever pay less than the minimum monthly guarantee. The expert further testified that the minimum monthly guarantee represents the market rate at DIA because DIA is its own market. This approach dismisses as irrelevant data from other, similar airports. More significantly, it assumes a uniform value across the different neighborhoods at DIA.

¶ 78 That assumption is incorrect. Passenger traffic varies from concourse to concourse, and as a result, so does the value of real estate at DIA. According to trial testimony, about half of the passengers at DIA travel through the B Concourse. As a result, one concessionaire does five times as much business at its B Concourse location than at its (otherwise identical) location in the Main Terminal. This difference proves that a square foot of space on the B Concourse is worth more than a square foot of space in the Main Terminal. Instead of accounting for this variation, however, the City applied a uniform value across the different neighborhoods at DIA, which led to an incorrect valuation of the concessionaires' interests. *See Bd. of Assessment Appeals v. Sampson,* 105 P.3d 198, 207 (Colo.2005) (explaining that a taxpayer who can demonstrate that an assessment is incorrect is entitled to relief).

¶ 79 The statute required the City to make a "reasonabl[e] estimate[ ]" of future pay-

ments under the concession agreements as the basis for calculating the actual value of the concessionaires' interests. § 39–1–103(17)(a)(II)(A). The City's "mass appraisal" approach did not comport with this requirement. The best estimate of future payments is past payments, and the record in this case established that most of the concessionaires paid a percentage of their monthly gross revenue, not the minimum monthly guarantee. *See, e.g., City & Cnty. of Denver v. Bd. of Assessment Appeals,* 848 P.2d 355, 360–61 (Colo.1993) ("[A]ctual rent received [is] a factor in determining the value of the property. . . ."). Rather than assume that all concessionaires would pay the minimum monthly guarantee for the life of the agreements, the City should have estimated the actual value of the concessionaires' interests based upon each concessionaire's historic rent payments.

¶ 80 The statute also required the City to use comparable market rents to calculate the actual value of the concessionaires' interests where "it is shown" that actual rents are not representative of market rents. § 39–1–103(17)(a)(II)(A). It is thus incumbent on the assessor to inquire into the market rate and compare it to the actual contract rent. Especially where actual rent is a percentage of revenue, the ARL directs the assessor to research comparable properties because percentage rent likely comprises some value attributable to the business, which should be separated from the value of the property interest. The City circumvented this step with the facile assumption that the only comparable market for concessions at DIA was the concessions at DIA; therefore the actual rents paid by the concessionaires (approximated as the minimum monthly guarantee) equaled the market rent. This syllogism disregards the purpose of market comparison, which is to determine whether rents paid by the concessionaires at DIA were representative of rents for similar properties outside of DIA. The statute and the ARL required a more thorough inquiry from the City. Absent that inquiry, it is unclear whether market rents should have been substituted for actual rents to calculate the value of the concessionaires' interests.

¶ 81 For the foregoing reasons, the City's "mass valuation" of the concessionaires' interests based on the assumption that they would all pay the minimum monthly guarantee for the duration of their concession agreements departed from the statutory scheme and led to an incorrect valuation. To hew to the statute, the City should have calculated the actual contract rent for each concessionaire based on the percentage rent historically paid by that concessionaire, and compared that amount to the current market rate for similar properties. I would remand this case to the court of appeals with instructions to return it to the trial court for further proceedings to determine the value of the concessionaires' interests according to the method set forth in section 103(17)(a)(II). I therefore respectfully dissent from Part IV of the majority opinion.

JUSTICE EID, dissenting.

¶ 82 The majority holds that the Concessionaires' possessory interests are taxable because they meet the three-part test of *Board of County Commissioners v. Vail Associates, Inc.,* 19 P.3d 1263 (Colo. 2001). I have no issue with the majority's recitation of the three factors, including the independence prong, which requires "an interest that provides a revenue-generating capability to the private owner independent of the government property owner." *Id.* at 1279. The problem with the majority's opinion is that it simply applies the three-factor test without fleshing out what the test is meant to capture—namely, the "significant incidents of private ownership" that make the interest taxable in the first place. *Id.* In my view, an ownership interest is "significant" when it is akin to "private ownership," as was the case in *Vail Associates. Id.* at 1267, 1278–80 (finding the "occupancy, use, and enjoyment of 12,590 acres of federal land . . . for the operation of its ski area through [the year 2031]" demonstrated "significant incidents of private ownership" and thus was taxable). Without a sense of what counts as a "significant" ownership interest, application of the factors devolves into the simple identification of *any* evidence that the particular factor exists. For example, under the majority's approach, any evidence that the Concession-

aires' operations are independent of government control—however meager that may be—is sufficient to meet the independence prong. In the end, the majority's analysis leads to the result that the legislature sought to avoid—namely, "that the taxation of *any* possessory interest might lead to the taxation of *all* possessory interests, no matter how de minimis." *Id.* at 1278. Because the majority simply applies the three-part test of *Vail Associates* without a sense of what counts as a "significant" private ownership interest, I respectfully dissent from its opinion.

¶ 83 We derived the three-part test in *Vail Associates* from *Mesa Verde Company v. Montezuma Board of County Commissioners (Mesa Verde I)*, 495 P.2d 229 (Colo. 1972), which involved the taxation of various facilities and improvements built on national park land since 1937 by the park's exclusive concessioner. The concessioner argued that the improvements were, like the land, owned by the federal government, and thus were tax exempt. *Id.* at 230. We rejected that position, concluding that the only thing that distinguished the concessioner's interest in the improvements from full private ownership was the fact that the concessioner lacked "bare legal title" to them. *Id.* at 233. We noted that the contract between the concessioner and the government gave the concessioner "a possessory interest in all [improvements] consisting of *all incidents of ownership,* except legal title." *Id.* at 230, 232 (emphasis added). "[I]t appears," we continued, "that the [concessioner] has full use of the improvements, as well as the right to operate these properties for private profit." *Id.* at 233. In such cases, "where a party has the right to possession, use, enjoyment, and profits of the property," it cannot avoid a "fair and just share of state taxation." *Id.* (concluding that "all the evidence indicates that the most significant incidents of ownership are possessed" by the concessioner).

¶ 84 We distilled this language from *Mesa Verde I* into the three-part test in *Vail Associates*: "(1) an interest that provides a revenue-generating capability to the private owner independent of the government property

owner; (2) the ability of the possessory interest owner to exclude others from making the same use of the interest; and (3) sufficient duration of the possessory interest to realize a private benefit therefrom." 19 P.3d at 1279 (citing *Mesa Verde I*, 495 P.2d at 233). But importantly, the factors grew out of the "significant incidents" of ownership that the concessioner possessed by contract in *Mesa Verde I*—namely, "all incidents of ownership" except for legal title. 495 P.2d at 232. Similarly, Vail's permit from the federal government "entitled Vail to the occupancy, use, and enjoyment of 12,590 acres of federal land ... for operation of its ski area through ... 2031"—that is, all but legal title. 19 P.3d at 1267. Indeed, the fact that Vail's interest was akin to private ownership was so obvious we hardly analyzed the interest. *Id.* at 1280 (simply stating, without analysis, that the three-part test was met); *see also* maj. op. ¶ 43 (noting that "[w]e discussed neither the source of the ski resort's revenues nor any restrictions the government placed on the resort's operations").

¶ 85 In sum, when we spoke in *Mesa Verde I* and *Vail Associates* of significant incidents of ownership, we were talking about an interest analogous to private ownership. In both cases, the government owned the land, but the concessioner owned and substantially controlled the operations that took place on the land to such a degree as to be analogous to a private owner. Their interests were therefore taxable.

¶ 86 The possessory interests held by the Concessionaires in this case bear no resemblance to the interests at issue in *Mesa Verde I* and *Vail Associates.* The City controls virtually every aspect of the Concessionaires' business. As the majority acknowledges, maj. op. ¶¶ 9, 51–54, it controls what products they can sell, what their menus must include, what they can charge for their products, what hours they must operate, whom they may hire, and what improvements they may make. In my view, the Concessionaires' control of their business operations is not analogous to private ownership, and therefore their possessory interests do not display the requisite "significant incidents of private ownership." Future cases might be closer

and require difficult line drawing, but this is not one of them.

¶ 87 The majority applies the independence prong to these facts and concludes that "the City's operating restrictions in this case do not deprive Concessionaires of the independent revenue-generating capability of their concession spaces." *Id.* at ¶ 41. In other words, as long as a concessioner has *any* independence to generate revenue, its interest is taxable. And as the majority later concludes, although the City controls "some" aspects of their business, these operating restrictions do not "convert Concessionaires into agents or partners of the City." *Id.* at ¶ 54. This is simply the other side of the "any independence" coin: as long as a concessioner is not a government entity, any possessory interest it may hold must be taxable. But importantly, this is precisely the situation the legislature sought to avoid— namely, that the taxation of any possessory interest would lead to the taxation of all possessory interests, "no matter how de minimis." *Vail Associates,* 19 P.3d at 1278. In *Vail Associates,* we expressly disavowed such a result, stating that "[o]ur decision does not reach so far." *Id.* But today the majority has reached "so far."

¶ 88 In the end, if a set of factors is applied without regard to the ultimate goal to be reached, the factors amount to nothing more than a list to be checked off and added up. But we have expressly disavowed this approach in other contexts, including, most recently, the set of factors to be considered in determining whether a defendant's statements during custodial interrogation are voluntary. *See, e.g., People v. Liggett,* 2014 CO 72, ¶ 22, 334 P.3d 231, 237 (cautioning that a list of thirteen factors used to determine whether a defendant's statements made during custodial interrogation were voluntary must be applied not as a mechanical checklist, but rather "to inform the ultimate inquiry, which is whether the police's conduct was coercive so as to overbear the defendant's will") (citing *People v. McIntyre,* 2014 CO 39, ¶ 16, 325 P.3d 583, 587). Here, the ultimate inquiry is whether the possessory interest in question approximates private ownership such that it is taxable.

¶ 89 Under my analysis, it is unnecessary to reach the valuation question in this case. I note, however, that the "significant incidents of private ownership" question is related to the valuation component; if the ultimate taxable interest is not adequately developed and defined, difficulties in placing a value on that interest will follow. *See* maj. op. ¶¶ 57–71; conc. & dis. op. ¶¶ 77–81. Because I do not believe the Concessionaires' possessory interests are taxable in the first instance, I respectfully dissent from the majority's opinion holding otherwise.

I am authorized to state that JUSTICE COATS joins in this dissent.